91 So.2d 156 (1956)
Virginia WEBB
v.
The STATE of Louisiana Through DEPARTMENT of INSTITUTIONS.
No. 4309.
Court of Appeal of Louisiana, First Circuit.
November 26, 1956.
Rehearing Denied January 2, 1957.
*157 Jack P. F. Gremillion, Atty. Gen., Harry Fuller, Asst. Atty. Gen., for appellant.
Dodd, Hirsch & Barker, Baton Rouge, for appellee.
LOTTINGER, Judge.
The trial judge, in this matter, rendered written reasons for judgment which we herewith reproduce in full:
"This is an action in tort against the State of Louisiana through the Department of Institutions for personal injuries sustained by the plaintiff when she was shot in her home on November 22, 1953, by an escaped convict from the Louisiana State Penitentiary at Angola. The State waived its Sovereign immunity and allowed itself to be sued by Act 163 of 1954.
"The undisputed facts are that one Ricardo Escobar did on the evening of November 21, 1953, escape from Angola prison and fled unseen into the Tunica Hills woods. Escobar on the next morning around 10 o'clock came upon the home of the plaintiff, Virginia Webb, and her husband. There, while still in the process of attempting to make good his escape, Escobar without cause went into the Webb home and fired two shots from a revolver stolen from an Angola State employee. One of the shots struck the plaintiff in the stomach. For this she seeks damages.
"There is no question but that Virginia Webb has the right to have her cause of action heard and decided in view of legislative *158 permission granted by a special act of legislature. It is well settled that a plaintiff with legislative permission has a cause and right of action against the defendant, State of Louisiana, if the facts in his petition would have disclosed a right and cause of action against any other defendant. Marler v. State [La.App.] 1955, 78 So.2d 26. The only practical difference between the State of Louisiana and any other tort defendant is the doctrine of sovereign immunity which was waived in this instance by the Legislature. In permitting suit, the Legislature waives both principles of sovereign immunity: (1) that the King (or State) can do no wrong, and (2) that the King (or State) cannot be sued in its own courts. Thus the plaintiff has a right and cause of action.
"Whether or not Virginia Webb or anyone else may recover against the State of Louisiana for the harms done by escaped convicts, however, presents a problem which is res nova in Louisiana and difficult to decide.
"It is difficult not only because of the fact that it is res nova in Louisiana but also because of the peculiar physical nature of the Angola prison. It might be added at this point that this Court is very familiar with Angola, its physical layout, operations, problems and personnel. This Court is also familiar with the convict, Escobar.
"The first question in this case is whether or not a State can be negligent or guilty of fault in the maintenance of a State prison. The second question is whether or not the State or any of the employees were guilty of negligence in relation to the handling of the prisoner, Escobar. If the first questions be answered in the affirmative, the sole remaining question would be whether or not such negligence had a casual (Causal) connection to the injury to the plaintiff in this case.
"Whether or not a state government can be guilty of negligence in the operation of prison seems obvious. The State has the capacity to commit tortious acts and to be negligent. Lewis v. State, 1945, 207 La. 194, 20 So.2d 917. The Military Department of the State of Louisiana has committed torts. Marler v. State [La.App.] 1955, 78 So.2d [26]. The Highway Commission has committed tortious acts. Varnado v. State, 1931 [18 La.App. 624] 136 So. 771. It has been held that the Department of Institutions could commit tortious acts in the operations of a State mental institution. Lewis v. State, 1945, 207 La. 194, 20 So.2d 917. Thus Angola officials and employees can be guilty of negligence. The Legislature has given the right to Virginia Webb to prove that the State of Louisiana was negligent in regard to her injuries in November, 1953.
"Before going into the question of the alleged negligence of the State employees at Angola, it is necessary to note the physical layout and security setup at Angola. Angola is an approximately eighteen thousand acre prison farm lying some twenty six miles northwest of the town of St. Francisville in West Feliciana Parish. It is bounded on the western side and most of the southern and northern sides by the Mississippi River. On the eastern side and part of the northern sides Angola is bounded by the Tunica Hills. The outer limits of Angola facing the Tunica Hills are marked by a series of guard towers along a levee. There is no wall or electric fence running along this line for security purposes. It is very unclear for just what purposes these so called guard towers serve. Captain Clyde Morgan, a security officer who had worked at Angola some twenty five years, testified that the towers were guard posts which `when a convict goes over the levee, they can call us and let us know.' R.P. 84. Assistant Warden R. F. Odom, who had been at Angola nearly nine years, when asked the security value of these towers, stated that they were guard towers. R.P. 151. Percy Tanner, another Angola security officer, indicated his belief that the towers were guard towers. R.P. 159. Captain McGehee Reid, the captain in charge of *159 security over Escobar, testified in answer to a question regarding the purpose of the towers: `Well, they were to guard the men on the farm.' R.P. 184. However, Warden Sigler in his testimony (R. 216, 217), as well as in his deposition, stated that the towers had little if any security value and were primarily useful as fire towers. Even though it seems quite odd for the Warden to have such different views from those of his security personnel, he seemingly is the one to know the security value of the towers.
"There are a number of different camps at Angola at different places where prisoners are kept. Around each camp there is a fence with at least one guard tower. Warden Sigler testified that `The penitentiary is the perimeter of the camps.' (R.P. 216). When the prisoners are outside the confines of their particular camp, the security is the supervision kept over their work.
"However, in relation to the prisoner Escobar, the security set-up seems to have been different. Escobar had been made a `trusty' and was on November 21, 1953, imprisoned in the `trusty' camp, Camp E. According to the testimony of Warden Sigler the security of those prisoners, including Escobar, living in Camp E was that of a system of checks. Trusties, according to Warden Sigler, have no liberties other than they are not considered custodial risks to the point of having to be constantly under guard, but are kept under constant check and supervision. (R. 219). In relation to Escobar, Sigler stated that if two hours went by without a check being made on him, he would consider it careless on the part of the checker. (R.P. 218). Captain Maynard, who was chief of security when Escobar escaped, testified that Escobar should have been checked within every two hours during the daylight and within every hour at night according to his order. (R. 253).
"As additional parts of the security arrangement, prisoners were not supposed to have access to alcohol, narcotics or firearms and weapons.
"The facts of this case proved by the preponderance of the evidence at the trial appear as follows: On November 21, 1953, Escobar was a trusty prisoner at Angola. He had a criminal record of convictions of burglary and theft in 1940, rape in 1943, disturbance in 1948, carrying concealed weapon in 1951, burglary in 1952. On March 27, 1952, he was committed at Angola. In December of 1952 he was given the status of trusty. In July of 1953 he was assigned to work as a clean up man in the Angola Hotel. On November 7, 1953, two weeks before the escape, Captain Reid, who was in charge of Escobar, reported to the Angola officials in a written report that Escobar was capable of working under supervision only. (Prison Record of Escobar, Plaintiff Exhibit 4). However, the record clearly indicates that on the escape day Escobar was not under close supervision. He was working in the Angola Hotel as a clean up man. He had been sent out to pick cotton and came back to the hotel between four and five o'clock. He testified that he didn't recall being checked after that (R.P. 15). P. A. Tanner, who had supervision over Escobar when he escaped, testified that the last check made on Escobar was at five thirty. (R.P. 163). Escobar then drank some whiskey and took some dope, according to his testimony, stole an employee's gun and walked away about seven o'clock. (R. P. 40-43). Escobar states that the whiskey, dope and gun were taken from the rooms of free employees which had been left unprotected. There is no definite proof that he did obtain the whiskey, but no proof to the contrary. It is definitely established that he did get the gun and the dope. Both were found on him. The record also indicates that a prisoner could have obtained both whiskey and dope.
"There is some question as to the time Escobar was missed. Tanner who had supervision over Escobar, at the time in *160 question, stated that Escobar was supposed to have been back on the Camp E yard between seven thirty and eight and when he didn't show up during that interval he went to the hotel looking for him. (R.P. 163). However, Chief of Security Maynard indicates that he was not notified until shortly before midnight. (R.P. 248) and also the radio log of Angola does not show any mention of an escape until around midnight.
"Captain C. C. Dixon, who was in charge of the dogs, testified that when he got there between eight and ten o'clock they were still having roll calls at Camp E to find out who escaped. They did not know it was Escobar. (R.P. 345). This indicated that they might never have checked or missed Escobar until Camp E was short at the nine o'clock count. From all the evidence, however, it appears that Escobar was missed around eight o'clock or shortly thereafter and it was definitely established to be an escape after several roll call checks at Camp E and checks of the hotel an hour or so later. After that it appears that the regular capture procedure was employed.
"From the foregoing, including knowledge of the physical layout at Angola, the frequency of escapes, the testimony of the Angola officials and all the relevant facts, it appears obvious that the State was guilty of negligence in relation to the handling of Escobar at Angola.
"The State was negligent in allowing Escobar to escape in several particulars. During the year that Escobar escaped, 1953, there were one hundred and two convicts that tried to leave Angola by Warden Sigler's count. (R.P. 226). The number can probably be explained by the security system of that time. It was relatively easy for a prisoner to leave. The security seems to have been that he would have been missed in a matter of hours and because of the rough terrain of the Tunica hills could be apprehended by the use of bloodhounds and guards before he could travel many miles. However, such a system in effect deliberately exposed the people living in close proximity to Angola to a perilous and unnecessary risk. The operation of any concern, be it a business, prison, or otherwise, which creates a risk, danger nuisance or cause of harm to another is actionable negligence. There is no question but that Virginia Webb was subjected to this risk and harm and was injured thereby.
"Anyone what knows or has a chance to study Escobar, observe his actions and study his criminal record, can obviously see that he is a dangerous criminal. For example, see the testimony of Sheriff Teddy Martin at pages 145 and 146 in the record. It was negligence for the security employees at Angola to fail to check a criminal like Escobar for near three hours, two hours of which were after dark. Security Chief Maynard stated that it had been ordered that such prisoners be checked at least every hour after dark. (R.P. 253-254)
"Where a prison has the escape frequency that Angola had during 1953 and before, and where such prisoners were continuously harassing the people in the community, it was negligence for the prison to take no steps toward warning the populace that had been exposed to the risk created, especially when they could have rung an available whistle. (R.P. 152).
"According to the testimony of Security Chief Maynard the employees at Angola were negligent in not getting all of the escape machinery in action promptly, after Escobar was missed. (R.P. 249). The record indicates that Security Chief Maynard was not informed until about midnight and Escobar was missed at least by nine o'clock.
"There can be no question but that the State was negligent in failing to keep closer supervision over Escobar while he was working at night alone. Captain Reid who was in charge of Camp E and Escobar, testified that Tanner was charged with the knowledge of Escobar and should have checked him every hour or so. (R.P. 201). This he failed to do and was negligent in *161 not checking at all after five thirty. In connection with Tanner's failure to maintain a proper check on Escobar his testimony indicates his excuse for his negligence:
"Q. If that's true, would you tell me how Escobar escaped? How he walked away? Whose fault was it, Mr. Tanner?
"A. Well, they been running. They were running before I went there and they are still running. Whose fault was that?
"Q. I don't know. I'm asking you. You were on duty that night, Mr. Tanner?
"A. If you had as many men to watch over at that camp as I did at that time, I'd like to see you watch all of them at one time.
"Q. You had too many of them so that you could not watch them properly? Is that what you're saying?
"A. Probably at the particular time, yes sir. (R.P. 173).
"Thus the only man charged with checking Escobar and knowing of his presence confesses that he did not and could not properly watch Escobar. That was negligence.
"The State was negligent in allowing Escobar to obtain a gun at the prison. It seems undeniable that Eddie Bordelon, a state employee, was negligent in leaving his pistol at Escobar's disposal. For this negligence he was fired. The State is responsible for its employees. Marler v. State [La. App.] 1955, 78 So.2d 26.
"Not only was the employee, Bordelon, guilty of negligence, but also the prison officials were guilty of negligence in this instance. They had not taken the proper safeguards and done all that was reasonable to insure that convicts would not be able to obtain firearms. There appears to have been an oral understanding prior to Escobar's escape that guns should be kept in steel lockers or deposited at security offices for safe keeping. No one man was responsible for guns in a certain area. There was no roster showing who had guns and where they were. Immediately after Escobar's escape, however, a written order was issued and proper steps taken for security of weapons. The negligence and loose security of firearms in the hotel at the time of Escobar's escape is clearly shown by the fact that several other men who lived in the hotel registered their weapons pursuant to the new order several days after Escobar's escape. Nettles, Delose, Wylie, Carter and Dupre all of whom lived at the hotel, immediately after Escobar's escape, registered weapons with Captain Reid which had previously not been turned in. (R.P. 198-199). It is only reasonable to believe that these men had kept their weapons in the hotel. Escobar, himself, stated that he had seen several guns lying around in the hotel. (R.P. 12). Leaving weapons where convicts can get them and having a loose security system where such is possible is clearly negligence. Bordelon, the owner of the stolen gun, testified that he was never instructed orally or written as to what to do with his gun. (R.P. 256-257).
"Escobar testified that he had taken `goof balls' which he had gotten in the Angola Hotel. Although there was no convincing evidence that he got them there, there is no question but that he did have some type of narcotics with him when he was captured. He had them in a box marked `reducing pills.' Captain Morgan, who took the pills from Escobar, testified he thought they looked like benzadrine tablets. He testified that they looked like some benzadrine tablets he had taken from prisoners before. (R. 99).
"The remaining question is whether or not there was a sufficient causal connection between the negligence and the injury. There seems to be little question but that there was.
*162 "The loose security in failure to check Escobar exposed the inhabitants of the community in the immediate proximity to Angola, including Virginia Webb, to just the type of injury she sustained. Were it not for the State's negligence this injury would not have happened. It is definitely foreseeable that convicts escaping through the negligence of the state would harm the people in the Angola area. This injury was directly within the risk area created by the negligence of the State and its employees.
"That injuries of this type caused by escaped convicts was foreseeable is clearly indicated by the passage of Act number 204 [205] of 1954 by our Legislature. That Act has now been incorporated in Title 15, Sec. 867 of the Revised Statutes of 1950 [LSA-R.S. 15:867]. The legislative intent of that Act is indicated by its title which reads `An act to authorize the Department of Institutions to pay certain claims for damages sustained through actions of prisoners committed to the state penitentiary and/or employees of the penitentiary while such prisoners are in the act of escaping and/or such employees are in hot pursuit of such prisoners.' There is no question but that Escobar was in the act of escape in this instance. Also, there is no question but that Virginia Webb could have received up to the $1,000.00 limit for the damages she incurred as a result of this escape.
"It was certainly foreseeable that the convict might use a gun, if he could get across to one, to shoot people, while attempting an escape. An escape is almost always foremost in the mind of a dangerous criminal. It was foreseeable that leaving a dangerous criminal unchecked for hours at night would give him an immediate opportunity to attempt his goal. Also, it was foreseeable that leaving dope and whiskey at his disposal would only increase the probability of an attempted escape. It is clearly foreseeable that an armed, and possibly crazed, convict might shoot someone in the risk area while attempting to perfect an escape.
"In her petition, the plaintiff has asked for a substantial sum for loss of wages. Some proof of this loss was entered at trial. However, in the opinion of this court, such recovery is not permissible under the law. In Louisiana, a married woman's wages are community property, and only the husband can sue for the loss of the wife's wages. Here the legislature did not authorize the husband to sue, nor did he attempt to join in the suit for that purpose. Any attempt here by Virginia Webb's husband to recover her wages cannot be granted. This should have been the subject of an exception of no cause of action. It would have undoubtedly been good insofar as the loss of wages is concerned. Therefore, the Court on its own motion finds that all claims for past and future loss of wages must be denied. For the same reasons any medical expenses incurred are not recoverable.
"In this case Virginia Webb did receive serious bodily injury. Her physical pain in suffering was intense. In the opinion of Dr. Magruder, Virginia Webb is now a psycotic. (R. 111). It is the opinion of Dr. Magruder that Virginia Webb is suffering from a psychotic depressive reaction which was caused by a sudden and real experience of having in reality been faced with death at the hands of a prisoner, namely, Escobar. As treatment, Dr. Magruder administered electric shock treatments to Virginia Webb. It is common knowledge that such shock treatments carry with them a great deal of pain and suffering. In the stipulated testimony of Dr. Elizabeth Faust, another psychiatrist, she also found Virginia Webb to be suffering from a neurotic condition, although she was not able to state with certainty its origin.
"In personal injury cases each case must, to some extent stand alone insofar as the measurement of damages are concerned. In view of the fact that this plaintiff has endured tremendous past pain and suffering, and in all probabilities will continue to suffer always in some proportions, an award of $10,000.00 for past and future pain and *163 suffering seems reasonable. The mental shock, anxiety, and mental suffering of this plaintiff has been tremendous. There seems to be little question but that she cannot live the type of life that she had been accustomed to living. She is no longer a social being in any sense of the word. She is no longer capable of having the usual social relationships with the people of her own social and economic status. In short, her life has been reduced to little more than a mere existence, awaiting now only the inevitable death. For her damages in mental suffering, shock and anxiety, she should recover an additional $5,000.00.
"For the above and foregoing reasons, there should be judgment in this case, in favor of the plaintiff, Virginia Webb, and against the State of Louisiana in the full and just sum of $15,000.00."
A reading of the record reveals that the factual findings of the trial judge are amply substantiated. Furthermore, we think that under the circumstances the officials and employees were undoubtedly negligent in many respects and that their negligence was a direct and proximate cause of the injuries complained of. The appellant does not contend that the award was excessive and it will, therefore, remain undisturbed.
It should be pointed out, perhaps, that the views herein expressed are not inconsistent with those set forth in Green v. State of Louisiana. See La.App., 91 So.2d 153. In the latter case we stated that we did "not believe that the negligent operation of a car then unavailable, to have been the natural and probable and reasonable foreseeable consequence of the initially negligent acts or omissions of State employees * * *" In the case at bar, on the contrary, we do believe, as did the trial judge, that the inflicting of wounds on others in the course of escape by a convict through the use of a pistol made available by the negligence of State employees to be a most probable and reasonable foreseeable consequence of the original act or acts of negligence.
The appellant reurges on this appeal its contention that Act 163 of 1954 (the statute under which the suit was brought) is unconstitutional in that it violates Section 35 of Article 3 of our Constitution L.S.A. Its arguments in support of this position are substantially those raised in the case of St. Julian v. State, La.App., 82 So. 2d 85, 87, wherein the Supreme Court denied writs, and we stated as follows:
"We respectfully disagree with these conclusions. In our opinion, the constitutional provision would be meaningless if interpreted so as to permit waiver only of the State's immunity from the physical filing of the petition with the court, but not to permit waiver of the State's immunity for liability for the negligence of its employees. To so hold would require the courts merely to overrule exceptions to citation or ratione materiae but to dismiss the suit thereafter on the exceptions of no cause of action. In our opinion, the Legislature and the People of Louisiana did not in adopting the amended version of Art. 3, Section 35, in 1946 intend merely to permit authorization for claimants to physically file suits which immediately thereafter must be dismissed because of the State's immunity from liability; on the contrary, we feel that the plain intent was to permit waiver of the State's immunity from liability arising out of tort and otherwise."
In addition, the appellant contends that Act 163 of 1954 is a local law. We see no merit to this argument. The statute is not unlike many, many others which have been passed waiving immunity, none of which, that we know of, have ever been held to be local in nature. As a matter of fact the Supreme Court in the case of Lewis v. State, 20 So.2d 917, 920, stated as follows:

*164 "Notwithstanding a legislative act authorizing a suit to be brought against the State is of a special character, this Court has held that the waiving of immunity or exemption from suit of the State and the authorization by the Legislature to a person to sue the State is not a special or local law within the meaning of a constitutional provision requiring the publication of notice of the proposed introduction of such a law. It is simply a special act authorizing a person to sue, needing no notice to be given to authorize its enactment and being uncontrolled as to its own course."
Finally, the argument is advanced that Act 163 of 1954 was repealed impliedly by the passage of Act 205 of that year. We fail to see where the acts are in conflict and, besides, implied repeals are not favored.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.