Rosalyn Barden **NELSON** and Dennis L. Barden, Plaintiffs-Appellees, Cross-Appellants,

v.

**PARISH OF WASHINGTON,** Defendant,

v.

**WASHINGTON PARISH SHERIFF'S DEPARTMENT** and American Druggists' Insurance Company, Defendants-Appellants, Cross-Appellees.

No. 85–3575.

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1986.

Ben W. Lightfoot, Baton Rouge, La. for appellants.

Robert E. Winn, Jerome K. Lipsich, Patricia D. Tunmer, New Orleans, La., for American Druggists' and Washington Parish Sheriff's Dept.

Ray W. Breland, Jr., Bogalusa, La., for Rosalyn Barden Nelson.

Margaret E. Woodward, Barham & Churchill, New Orleans, La., for Dennis L. Barden.

Before POLITZ and GARWOOD, Circuit Judges, and SHAW [*], District Judge.

SHAW, District Judge:

A. Course of Proceedings and Disposition in the Court Below.

Rosalyn Barden Nelson filed suit against Washington Parish Sheriff's Department and its insurer on May 14, 1982, alleging that the rape and murder on or about May 2, 1982, of her nine-year-old daughter, Jennifer Barden, had resulted from the Sheriff's Department's negligence in having permitted Billy Wilson, a convicted rapist, to escape from the Bogalusa City Jail, on April 18, 1982, where he had been incarcerated. The action against the Washington Parish Police Jury and its insurer was dis-

[*] District Judge of the Western District of Louisiana, sitting by designation.

missed on July 14, 1982, and Mrs. Nelson subsequently filed a supplemental and amending complaint naming as defendant in the action the Washington Parish Sheriff's Department, its insurer American Druggists' Insurance Company, and the Parish of Washington and its insurer. The court granted summary judgment in favor of the Parish of Washington, through its police jury, and its insurer on August 3, 1983. On November 21, 1983, Nelson filed a third supplemental and amending complaint, naming as defendants Washington Parish Sheriff Robert Lyons, and the sheriff's insurer, American Druggists' Insurance Company. By a complaint filed on July 11, 1984, Jennifer Barden's father, Dennis L. Barden, represented by separate counsel, was joined as plaintiff.

After three days of trial, the jury rendered a verdict for plaintiffs in the amount of $1,500,000 representing a $1,000,000 award for the child's pain and suffering and a $500,000 award for the damages suffered by her parents. Accordingly, the court entered judgment against the Washington Parish Sheriff's Department and American Druggists' Insurance Company.

On motion of Washington Parish Sheriff's Department and American Druggists' Insurance Company, the court reduced the jury's $1,000,000 award to the plaintiffs for the pain and suffering experienced by Jennifer to $275,000. The defendants American Druggists' Insurance Company and Washington Parish Sheriff's Department have appealed from that judgment, and

plaintiffs Rosalyn Barden Nelson and Dennis L. Barden have cross-appealed from the order of remittitur.[1]

### B. Statement of Facts.

On September 9, 1980, Billy Wilson was incarcerated in Bogalusa City Jail, for the aggravated rape of a nine-year-old girl in Angie, Louisiana. He had been sentenced to life imprisonment for having committed this offense. Wilson had been arrested for this crime after he had attempted to abduct in his pickup truck another little girl who had been playing in her neighborhood.[2]

Wilson had repeatedly announced to his jailers in the Bogalusa City Jail that he could not bear to go to the state penitentiary, and that he would kill himself before he would be sent there. Louisiana law dictates that the transfer of a prisoner to the state penitentiary is required within fifteen days of the date a prisoner's conviction becomes final. Thus, he would have had to have been transferred by April 29, 1982.[3]

The Bogalusa City Jail, built in 1918, was an old and decrepit facility. Two cells were equipped, however, with "roll-type" bars that had hollow steel tubes fitted with rolling steel rods in the inside. A hacksaw could not gain purchase on the revolving inner bars, and thus, the cells were virtually escape-proof. No prisoner had ever sawn his way out of these two cells, but cell No. 3, in the older section of the jail, had rusted steel bars through which prisoners had previously sawn. Wilson was in-

1. Courts have long sanctioned the practice of conditioning a denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount. In this way, the plaintiff is given the option of either submitting to a new trial or of accepting the amount of damages that the court considers justified. *Blunt v. Little*, C.C.D.Mass. 1822, 3 Fed.Cas. 760, No. 1578; C. Wright and Miller, *Federal Practice and Procedure*, § 2815 (West 1973 and Supp.1985). However, this issue need not be addressed for reasons hereinafter set forth.

2. In addition to this record of kidnapping and rape, Wilson had a formidable record of escape attempts. He had escaped briefly from the Mississippi compound where he had been awaiting transfer to Louisiana for trial on the charges of

aggravated rape and kidnapping. In January, 1982, he escaped briefly from the St. John Parish Prison, where he had been transferred on another charge.

3. Wilson was not the first criminal to have escaped from the Bogalusa City Jail. In the twenty-one months preceding Wilson's escape, there had been fifty-four escapes from the Bogalusa City Jail, a facility that houses only thirty-six prisoners. A federal court supervising the operation of the prison had ordered that specific measures be taken to stem the increasing number of escapes. Sheriff Lyons and Chief Criminal Deputy Gill, who were responsible for the administration of the prison, apparently never communicated the court orders to the deputies.

carcerated in this cell. Moreover, the deputies had allowed Wilson to choose a bunk under the windows leading out to the alley, where neither he nor his actions could have been observed from the cell door. The jailers made no effort at any time during the night, before or after the lights were turned out, to make voice checks of the prisoners who could not be seen.

The sheriff's department overseeing Wilson's incarceration was exceedingly disorganized. Sheriff Lyons had hired and had put in charge of the prison people who did not have any prior police experience. Furthermore, Sheriff Lyons had given the deputies neither training nor supervision. Rather than having replaced a broken shower knob in Wilson's cell, the deputies had provided him with a large, heavy and powerful set of vice-like pliers. Furthermore, the deputies had left the pliers with Wilson at all times, not only when the shower was in use. Using the pliers and a hacksaw, Wilson and his cellmate, Roy Hill, sawed through the cell bars in approximately one week, working only at night, when only one deputy was on duty.

Wilson and Hill used a tape player to mask the resultant noise. During the week that Wilson and Hill worked on the window, the deputies neither searched the cell for contraband nor checked the bars on the windows.

Wilson and Hill lowered themselves from the window at about 10:30 p.m. Nevertheless, during the course of the night, Deputy Richardson, who was on duty, dutifully logged nineteen security checks of the prison every half hour; he noted nothing was amiss. Because he was alone on duty, however, Richardson could not go into the cells to observe the prisoners. Moreover, neither Wilson's and Hill's bunks nor their window could be seen from the door. Twice during the night, teams of two officers each brought prisoners to the jail, but Deputy Richardson did not take advantage of the officers' backup support to attempt a visual observation of the other prisoners. Deputy Richardson again declined to make a visual inspection of Wilson's cell when he, Richardson, left the jail, at 4:50 a.m., the following morning. Finally, Richardson made no voice checks during the night. It was not until ten hours after Wilson's and Hill's escape, when breakfast trays were passed out the next day, that the jailers discovered the two prisoners were missing. Before reporting the escapes to their supervisors, the jailers followed their daily routine of dispensing medication to the prisoners.

On the day after the escape, a couple living in the nearby countryside reported that two men had asked permission to cross their fields into a wooded area. Chief Criminal Deputy McNeese deduced that the men the couple had spotted were Wilson and Hill. He concentrated his search force of twelve deputies in that area and set up patrols. At 2:30 a.m., Deputy McNeese advised the search party how to position their units and maintain patrols so that they could confine the escapees in the surrounding area. Having been on duty for several uninterrupted days, he went home to bed, intending to move in at daybreak and make the arrests. Thirty minutes after he had left, the entire search party had dispersed, abandoning its mission. Deputy McNeese could offer no explanation for the search party's conduct.

Jennifer Barden lived in the small town of Gallatin, Missouri, with her mother, Rosalyn Barden Nelson, her stepfather, and three siblings. On the afternoon of Saturday, May 1, 1982, Jennifer and her younger brother Gilbert were playing frisbee in the front yard of their home. Wilson circled the block in a green pickup truck, which he had stolen in Garden City, Missouri. Jennifer went to retrieve the frisbee, and, as Wilson approached her, she shouted to Gilbert to "go back!" She entered Wilson's truck, and was last seen the following morning, in northern Missouri. The abduction occurred thirteen days after Wilson's escape, over seven hundred and fifty miles from the Bogalusa City Jail.

### Legal Analysis

"There is still the problem of an end to liability, of a place to stop. It is still unthinkable that anyone shall be liable to the end of time for all the results that follow in endless sequence from his single act. Cau-

sation cannot be the answer; in a very real sense the consequences of an act go forward to eternity, and back to the beginning of the world."

Prosser, *Palsgraf Revisited,* 52 Mich.L. Rev. 24–27 (1953).

## A. Standard of Review.

Because the findings of the jury are not challenged on appeal, this court is concerned only with the legal conclusions to be drawn from the facts as found. Moreover, the "clearly erroneous" restriction of Fed. R.Civ.P. 52(a) is not applicable to this court's review of the trial court's rulings on questions of law.

The jury found from a preponderance of the evidence that the defendants' negligence was a cause in fact of the plaintiffs' injuries. The trial court, however, did not find as a matter of law that the defendants owed a duty of due care to Jennifer Barden. Rather, the trial court simply made no ruling as a matter of law on this issue, and it awarded damages to plaintiffs. This court accepts the jury's findings of fact as not being clearly erroneous; however, it is incumbent upon this court to make a determination of the scope of defendants' duty of due care. Does this duty encompass Jennifer Barden, who resided over seven hundred and fifty miles from defendants, and who was abducted by Billy Wilson thirteen days after defendants' negligent acts in having facilitated his escape?

## B. Duty-Risk Analysis.

### 1. Duty-Risk Jurisprudence.

Louisiana has adopted a duty-risk approach to negligence cases. *See Hill v. Lundin & Associates, Inc.,* 260 La. 542, 256 So.2d 620 (1972), *citing* Green, *The Causal Relation Issue in Negligence Law,* 60 Mich.L.Rev. 543 (1962), and Green, *Duties Risks, Causation Doctrines,* 41 Tex.L.Rev. 42 (1962); *Andrus v. Trailers Unlimited,* 647 F.2d 556 (5th Cir.1981). This theory provides that a plaintiff must

establish four elements to sustain a successful negligence cause of action. First, the plaintiff must show there was a causal relation between the defendants' conduct and the plaintiffs' injury. Rather than constituting the "proximate cause," causal relation is essentially a factual concept that is determined by the issue of whether or not defendants' conduct was a substantial factor contributing to the plaintiff's harm. *Andrus v. Trailers Unlimited, Etc.,* 647 F.2d at 559.

The second element plaintiffs must prove to establish a successful negligence case is that the defendants' duty, whatever it may have been, extended to plaintiffs' specific injury. That is, the liability of defendants must depend upon a principle of law which encompasses both the defendants' conduct and the protection of the victim against the risk of injury created by that conduct. *See Hill v. Lundin & Associates,* 260 La. at 547, 256 So.2d at 622; *Dixie Drive it Yourself System v. American Beverage Co.,* 242 La. 471, 486–94, 137 So.2d 298, 304–06 (1962); *Andrus v. Trailers Unlimited, Etc.,* 647 F.2d at 559.

The third element the plaintiff must show in order to sustain a negligence cause of action is that defendants were negligent; that is, that the defendants have breached their duty with respect to the plaintiffs. This element demands two determinations:

(1) Should the defendants, as ordinarily prudent persons under all the circumstances of their conduct, have reasonably foreseen some injury to the plaintiffs of the same general character as that injury they incurred?

(2) Did defendants fail to exercise reasonable care to avoid the injury?

After plaintiffs have established the third element, plaintiffs must then prove their damages. *Andrus v. Trailers Unlimited, Etc.,* 647 F.2d at 559.[4]

Defendants do not concede that they owed Jennifer Barden a duty of due care. Therefore, defendants conclude that they

---

**4.** Defendants concede that plaintiffs have established a causal relation between defendants' actions and plaintiffs' damages. Furthermore, plaintiffs have established that they have suf-

fered damages as a result of defendants' actions, although the parties dispute the amount of damages.

could not have been negligent towards Jennifer. Thus, the crucial question before the court is whether defendants' duty, whatever it may have been, extends to the specific injury or loss plaintiffs have suffered. A duty is an obligation to which the law will give recognition and effect. The scope of defendants' duty depends upon how far the law's protection will be extended. *"It is, therefore, an inherently judicial function to determine whether or not there is any legal principle to cover the risk of injury sustained by plaintiffs."* *Andrus v. Trailers Unlimited, Etc.,* 647 F.2d at 559. (Emphasis added)[5]

### 2. Did Defendants Owe Plaintiffs a Duty of Due Care?

Louisiana caselaw demonstrates that a variety of factors are dispositive to the court's decision as to whether or not a governmental custodian is liable only when he negligently permits the escape of a prisoner with known violent propensities. These factors are:

1. Whether or not the escapee had a propensity for violence that was known or should have been known to his jailers. *Lloyd v. State,* 395 So.2d 1385 (La.App. 1st Cir.1981); *Walker v. Interstate Fire & Casualty Insurance Co.,* 334 So.2d 714 (La.App. 2d Cir.1976); *Webb v. State,* 91 So.2d 156 (La.App. 1st Cir.1957); *Green v. State,* 91 So.2d 153 (La.App. 1st Cir. 1956);

2. Whether or not the escapee was incarcerated to protect the public against the particular type of intentional harm that he perpetrated against the victim. *Walker v. Interstate Fire & Casualty Insurance Co.,* 334 So.2d at 716; *Geiger v. State,* 242 So.2d 606 (La.App. 1st Cir. 1970); *Frank v. Pitre,* 353 So.2d 1293 (La.1977);

3. Whether or not the escapee posed a particular risk of escape that was known or should have been known to his jailers. *Geiger v. State,* 242 So.2d at 608; *Webb v. State,* 91 So.2d at 160;

4. Whether or not the injury occurred during the process of escaping. *Brown v. American Druggists Insurance Co.,* 476 So.2d 881 (La.App. 2d Cir.), *writ denied,* 479 So.2d 366 (La.1985); *LeBlanc v. State,* 393 So.2d 125 (La.App. 1st Cir.1980); *Webb v. State,* 91 So.2d at 162; and

5. What relationship the time and the place of the injury have to the escape. *Webb v. State,* 91 So.2d at 162; *Reid v. State,* 376 So.2d 977 (La.App. 1st Cir.1979); *Walker v. Interstate Fire & Casualty Insurance Co.,* 334 So.2d at 715; *Geiger v. State,* 242 So.2d at 607.

Each of these five elements is crucial to the court's determination of whether or not a governmental custodian is only liable to an injured victim when the custodian negligently permits the escape of a prisoner. Louisiana courts, however, have not allocated equal weight to each element and have often differed in the determination of which factors are critical to the scope of the duty. Rather,

[w]hat has happened since *Webb* is that a plaintiff's emphasis has often been placed on the proximity in time and space of an escaped inmate's offense to the point of his escape rather than on the proper question of whether the offense, regardless of its time and location, actually was an integral part of the process of escaping.

*LeBlanc v. State,* 393 So.2d at 127.[6]

The evidence clearly demonstrates that the first three elements enunciated above

---

**5.** Furthermore, because foreseeability is a jury formula for the determination of the violation of a duty, foreseeability is not the focal point for the duty-risk determination. Thus, under Louisiana's duty-risk theory, defendants may have been aware of many risks, yet this court may nevertheless decline to impose liability, after first having considered all of the relevant considerations. Conversely, the court may impose liability for risks that are completely unforeseeable. *Id.*

**6.** The jury made no finding as to whether or not Wilson was in the process of escaping when he

have been satisfied. Billy Wilson had a propensity for violence that was or should have been known to his jailers. He had been previously convicted of aggravated rape of a nine-year-old girl, and he was temporarily incarcerated in the Bogalusa City Jail for having abducted and murdered a nine-year-old girl in Angie, Louisiana. These facts surely put his jailers on notice that he had a propensity for violence. Moreover, Wilson was incarcerated to protect the public against the particular type of harm he perpetrated against Jennifer Barden, *i.e.*, abducting and murdering young girls. Finally, Wilson's comments about his determination to escape and the lax security at the Bogalusa jail clearly demonstrated or should have demonstrated to his jailers that he posed a particular risk of escape.

This court cannot easily dispose of the last element the plaintiffs must prove in order for them to prevail upon their claim, *i.e.* what relationship the time and the place of Jennifer Barden's injury had to Wilson's escape. Louisiana courts have not extended a jailer's duty to reasonably prevent the escape of his prisoners beyond the people with whom the escapee might come in contact in close proximity and time to his escape. In *Reid v. State*, 376 So.2d at 979, the escapee had perpetrated his crime eleven days and sixty miles away from the point of his escape. Because the court believed that the question of the ambit of the jailer's duty was dispositive, it elected to discuss that issue only. The court thus declined to conclude that the jailers owed plaintiffs a duty of due care because of the foreseeability that the escapee would commit a violent act. Because the victim's injury and death occurred eleven days and approximately sixty miles away from the escape, the court was "unimpressed" with plaintiffs' argument that the injury was inflicted during the escape. The court concluded that the scope of defendants' duty did not extend to the plaintiffs:

> Whether the problem be stated as one of ambit of duty, of proximate cause, of adequate cause, of legal cause or of other cause, the ultimate question to be decided by the court is whether as a matter of policy, recovery should be allowed when the damage is caused eleven days and sixty miles away. For an example, would recovery be allowed for the acts of an escapee who caused injury a score of years and several thousand miles from the place of escape. Obviously, the line has to be drawn someplace.

*Reid v. State*, 376 So.2d at 979.

The *Reid* court followed the jurisprudence adopted by the Louisiana Supreme Court in *Frank v. Pitre*, 353 So.2d at 1296. In *Frank*, the court found a sheriff not liable for injuries sustained by a policeman who was shot by an inmate who had been granted a "pass", even though he had been jailed for burglary and a parole violation. The court reasoned that the absence of a "closer connection between the act of the defendant and the injury to the plaintiff[]" precluded the court from extending the jailer's duty to protect plaintiff. *Id.* Similarly, in *Graham v. State, Health and Social Rehabilitation*, 354 So.2d 602 (La.App. 1st Cir.1978), the court found the State not liable for injuries inflicted by a mental patient over one hundred miles away from the place of escape. And in *Green v. State*, 91 So.2d at 155, the court stated:

> An institution's duty to restrain a convicted criminal is not based upon the purpose of protecting the general public from all harm that the prisoner might inflict if he were allowed to escape. A convicted person may be as dangerous on the day of his legal release as he was on the first day that he was confined, although the institution may still be under a legal duty to detain or to release him.

---

abducted and murdered Jennifer Barden. Be that as it may, the facts clearly indicate that Wilson had effectuated his escape by the time he harmed Jennifer. Furthermore, Wilson was clearly beyond the jurisdiction of this court at this time. Thus, this court will focus not upon whether or not Billy Wilson was in the process of escaping when he abducted and murdered Jennifer, but rather upon the proximity in time and space of Wilson's offense to the point of his escape.

There is no more reason for the State to be civilly responsible for the convict's general misconduct during the period of his escape than for the same misconduct after a legal release, unless there is some further causal relationship than the release or escape to the injuries received. *Id.*

Louisiana case law clearly demonstrates that Jennifer Barden did not fall within the scope of the Washington Parish Sheriff's duty to exercise due care in the prevention of escapes by prisoners. Only those people who reside within the vicinity of the prison, and who the prisoner injures within a reasonable time after his escape, may assert a cause of action against a negligent jailer. By requiring the escapee to have injured the victim during the course of his escape, the courts have necessarily imposed a time and space limitation upon the duty of a jailer to exercise reasonable care in preventing the escape of prisoners. This limitation, of course, is not static; rather it is dynamic and fact-dependent. It is not incumbent upon this court, however, to construe the parameters of this limitation. Suffice it to say that Louisiana courts have never extended the duty to include a plaintiff who was injured as far as sixty miles and as long as eleven days after the prisoner's escape, *Reid v. State*, 376 So.2d at 977; to a plaintiff who was over one hundred miles away from the escape, *Graham v. State*, 354 So.2d at 602; where the breach of duty and the duty breached "were not sufficiently related to the injuries received as to import liability for damage resulting from the breach[,]" *Green v. State*, 91 So.2d at 155; and to a plaintiff whose injury lacked a "closer connection between the act of the defendant and the injury to the plaintiff." *Frank v. Pitre*, 353 So.2d at 1296. The court in *Webb v. State*, 91 So.2d at 156–57, upheld plaintiff's claim for damages, but in *Webb*, the escapee injured the plaintiff only ten hours after his escape from the penitentiary and "while still in the process of attempting to make good his escape."

Thus, whether their opinions are couched in the language of proximate cause or of duty-risk, Louisiana courts have not extended a jailer's duty to reasonably prevent the escape of a prisoner to a plaintiff who has been injured without the state. Given the refusal of Louisiana courts to extend this duty, this court concludes that Jennifer Barden, injured over seven hundred and fifty miles and thirteen days after Wilson's escape, does not fall within the scope of the duty of the Bogalusa City jailers to reasonably prevent the escape of Wilson. In so holding, this court does not decide the exact scope of defendants' duty; rather, the court only holds that the proximity in time and space between the negligence of the defendants and the harm to the victim by one who has effectuated his escape, is too remote to extend the jailer's duty to protect the victim.

The judgments appealed from are reversed and the cause is remanded with directions to enter judgment for defendants.

REVERSED and REMANDED WITH DIRECTIONS.

