556 So.2d 644 (1990)
Martha B. EDWARDS and Danny Edwards, Individually and on Behalf of the Minor, Justin Edwards, Plaintiffs-Appellees,
v.
STATE of Louisiana, Ouachita Parish Police Jury, Ouachita Parish Sheriff's Department, Laymond Godwin and Richard Mathews, Defendants-Appellants.
No. 21093-CA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1990.
*645 Barnes, Jefferson & Robertson by Stephen A. Jefferson, Monroe, for defendants-appellants.
*646 Bruscato, Loomis & Street by C. Daniel Street, Monroe, for plaintiffs-appellees.
Before MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
MARVIN, Judge.
In this appeal of a judgment awarding damages to parents and their four-year-old son for injuries arising out of the abduction of the mother and son by an escaped prisoner, the issues are whether the duty of the sheriff-custodian of the escapee was breached and, if so, whether the duty extended to protect these plaintiffs in their particular circumstances.
In addition to raising the above issues, the sheriff and his liability insurer alternatively complain that the trial court's awards to the plaintiffs, totaling $35,000, are abusively high.
We affirm. Brown v. American Druggists' Ins. Co., 476 So.2d 881 (La.App. 2d Cir. 1985), writs denied.

THE PRISONER'S ESCAPE
Danny Weeks had been confined in the Ouachita Parish Jail awaiting trial on a first-degree murder charge to which he had confessed. On June 8, 1982, Deputy Richard Matthews took Weeks to West Monroe for a dentist's appointment that was apparently made by Weeks' sister. Before they left the jail, Matthews patted Weeks down, put leg irons on his ankles, and restrained his arms with cuffs attached to each side of a waist chain. Deputy Matthews stayed with Weeks, who remained in the leg irons and handcuffs, while the dental work was being performed.
When Weeks and Matthews left the treatment room, Weeks asked to use the restroom, as he had been allowed to do when Matthews escorted him to the same dentist a few weeks earlier. The restroom consists of two rooms, the first of which is entered from the hall and which contains a lavatory. A second door of the lavatory room enters the toilet room. Matthews visually checked both rooms before letting Weeks enter the restroom.
When Weeks entered the toilet area, he closed the door behind him. Matthews responded by opening this door one to three inches to afford him a view of part of Weeks' back and shoulder. While Weeks stood for three to five minutes at the toilet, Matthews stood a few feet away, at the restroom doorway of the hall, where he watched Weeks as well as the hallway. Matthews did not notice any unusual noise or movement by Weeks.
Weeks somehow released himself from the two handcuffs and one leg iron while in the toilet room. He then exited, physically attacking Matthews, pushing and causing him to lose his balance, and attempted to take Matthews' service revolver. Matthews kept Weeks from getting his revolver, but lost his grip on Weeks' collar in the struggle. Weeks succeeded in outrunning Matthews, who chased him. Weeks was about six feet tall and weighed less than Matthews, who was about 5'10" and weighed 195 pounds.
The record does not explain how Weeks got out of the handcuffs and leg iron. The trial court found:
At the time of the escape ... prisoners had some direct access to friends and relatives during visiting hours at the Ouachita Parish Jail. It was possible for visitors to pass objects to prisoners although such activity was forbidden. Since this escape, this procedure has been changed and no opportunities exist for transfer of items between visitors and prisoners.
Also, prisoners are strip searched, checked with metal detectors, and given different clothing, before trips away from the jail for medical, dental, or other such purposes [since this escape]....
Danny Weeks was incarcerated awaiting trial on a charge of first degree murder and was recognized by the sheriff and his deputies to be a dangerous prisoner. In some manner he was allowed by deputies to get a key which would unlock his hand and leg cuffs. Weeks may have obtained the key during visiting hours at the jail. The cursory search performed by Deputy Matthews before they left the *647 jail could easily have missed a small key hidden in Weeks's clothing.
Sheriff Godwin thought it was more probable that the key was hidden in the restroom at the dentist's office.... Weeks had been allowed to use the restroom after his first dental treatment, so he could reasonably presume Deputy Matthews would let him go to the restroom on his second visit. The one to three inch crack which Deputy Matthews left in the door to the toilet area was not sufficient for him to observe the movements of Weeks.
Matthews testified that other inmates have since shown him how to unlock leg irons and handcuffs, without a key, by twisting them on a stationary piece of metal or using a nail to pop the springs. Asked if he was close enough to Weeks in the bathroom to "hear those chains jingle or those cuffs unlock if they could have been unlocked," Matthews answered, "No, sir. I was standing outside one door and he was on [the] inside of the other door. At least I didn't hear anything, sir."
Matthews explained that visitors in 1982 were allowed access to prisoners through a small open window in each cell door and that holes had been punched in some cell doors with pencil-sized objects, making it "possible" for inmates and visitors to exchange things through these openings. A deputy patrolled the hall during visiting hours to prevent such exchanges.
After Weeks escaped, visits are allowed only away from the jail cells and in a room where Plexiglas separates visitors from prisoners and allows only verbal and visual communication between them.
Matthews, a former Marine, had worked as a deputy for four months before Weeks escaped. Like his fellow deputies in 1982, he had received only informal, on-the-job training in the handling of prisoners. After 1982 Ouachita deputies receive more professional and formal training in a program instituted to comply with a federal court order. Matthews was not reprimanded or fired after the escape was investigated but continued to serve as a deputy. The sheriff said:
I thought for a young deputy that he had done exceptionally well and, under the circumstances ... as well as anyone else could have done.
Weeks was eventually captured, only to escape from the sheriff's custody a second time. After being captured and convicted, Weeks escaped from Angola penitentiary. Matthews testified that after Weeks' escape prisoners are no longer permitted to use a restroom when they are escorted on trips outside the jail.
Although Matthews complied with the 1982 procedures for transporting a prisoner and never left Weeks completely unattended, he admitted that he was not close enough to Weeks to see or hear Weeks release his restraints, with or without a key. Regardless of when, where or how Weeks obtained the object with which he freed himself from the restraints, he could not have succeeded if the deputy had exercised reasonable observation. The trial court did not err in concluding that the deputy's conduct was unreasonable.

THE ABDUCTION
About noon on June 10, 1982, the second day of his escape and while the manhunt for him continued, Danny Weeks made it to the isolated mobile home occupied by Mrs. Martha Edwards and her four-year-old son, Justin, in rural Union Parish about 20 miles from the West Monroe dentist's office. Mr. Edwards was at work.
Weeks was armed with a hammer when he entered the home, threatening Mrs. Edwards and her son. There he obtained and armed himself with a .38 caliber pistol, changed into some of Mr. Edwards' clothes, shaved off his mustache, obtained food, and Mrs. Edwards' car keys.
Weeks forced Mrs. Edwards and her son into the car and then began to drive to and through Ruston and Natchitoches, briefly stopping once or twice on the outskirts of each city to use a public telephone in sight of the car. Each time Weeks stopped he told Mrs. Edwards that he was "desperate" and that "it would be very foolish" for her to try to get help or run away. She stayed *648 in the car with Justin during each of these stops.
Weeks stopped for about an hour along the riverbank in Natchitoches, near a boat launch and some retail shops. He parked under a tree and let Mrs. Edwards and Justin get out of the car but would not let them out of his sight, even when Mrs. Edwards asked if they could use the bathroom. She tried to signal passers-by without Weeks noticing, but was unsuccessful.
Driving for about another hour after he made the last telephone stop around 5:30 p.m., Weeks turned off the paved highway onto a gravel road, on which he drove for about five minutes. He then drove off the road, across a grassy clearing and about 100 yards into a thickly wooded area, where he stopped the car. Weeks briefly made sexual advances toward Mrs. Edwards which she successfully resisted, verbally and physically.
Shortly thereafter and apparently in response to arrangements Weeks had made during his telephone calls, Weeks left the wooded area about 8:00 p.m., on foot and with the car keys, telling Mrs. Edwards only that he would be back "in a little while." Mrs. Edwards and Justin, not knowing Weeks' whereabouts or where they were, remained, eventually going to sleep in the car with the doors locked. Weeks returned around 1:00 a.m. with a man in a pickup truck. Weeks put gas in Mrs. Edwards' car and, before leaving with the man in the truck, told her which direction to drive her car when she reached the paved highway. The truck turned in the opposite direction. Mrs. Edwards said:
He also tried to get me not to stop at the local sheriff's department there [in Jackson Parish]. He said if I stopped there I would just have to talk to them and then I would have to talk to Ouachita Parish, too. I think he was possibly trying to give himself some more time.
... I did not know where I was or what town I was headed towards.... I didn't know what his name was until we had gotten to the nursing home that night and the lady showed me the newspaper and his picture was on the front of the newspaper.
About 1:30 a.m. Mrs. Edwards drove into a town she learned was Jonesboro and found a nursing home "open." There she reported her predicament and sought help. She telephoned her husband and waited at the Jackson Parish Sheriff's Office for his arrival.
Mrs. Edwards testified that, during the 13-hour ordeal, Weeks had the pistol in the front of his pants, emphasizing to her that he was "desperate." He told her "not to try anything" each time he stopped during the day. When he left after dark from the secluded wooded area that she estimated was an hour's drive from the last town they drove through, he took the pistol and the car keys with him, telling her he would be back "in a little while." She did not know his whereabouts or proximity to the car. She explained that she repeatedly weighed in her mind the chance of escaping and seeking help but was not sure that she could succeed without further risk to herself and her son.
We have repeated the above circumstances to respond to the argument of defendants, made here and in the trial court, that because Mrs. Edwards did not exercise her opportunities to escape from Weeks, she "must have" known and assisted him in his escape, and then "made up the abduction story" to conceal her assistance.
Mrs. Edwards categorically denied that she knew Weeks before the abduction or that she assisted him in any way. The trial court expressly found her credible and noted that there "is not one iota of evidence to support ... defendants' insinuations." We agree.
Mrs. Edwards and her son were forcibly abducted by Weeks. The insinuations of defendants to the contrary are unfounded. We do not, and indeed cannot, find Mrs. Edwards' version of what occurred to be incredible. See Rosell v. Esco, 549 So.2d 840, 844-845 (La.1989).

THE DUTY ISSUES
There is no "rule" by which the extent of duty may be determined. Finley *649 v. North Assur. Co. of America, 476 So.2d 837 (La.App. 2d Cir. 1985). Whether the problem be stated as one of duty, of proximate cause, or of legal cause, the ultimate question is one of policy. Reid v. State through Dept. of Corrections, 376 So.2d 977, 979 (La.App. 1st Cir. 1979), writ denied.
We should seek to determine the exact risks anticipated by imposition of the legal duty that is sought to be enforced and the legal or policy considerations which may excuse the consequences of the neglect of that duty. Finley, supra, at p. 844.
The inquiry begins with cause-in-fact, a "but for" test into the logical, and not absurd, extremes. The cause-in-fact inquiry is readily and easily answered here. But for the deputy's failure to exercise reasonable observation of his prisoner at the dentist's office, Weeks could not have freed himself from his restraints. The deputy's omission was a substantial cause in fact of the escape. The second inquiry is into legal and policy considerations.

SOURCE OF DUTY
A custodian has a duty not to allow his prisoner to create an unreasonable risk of harm to the public. The custodian is liable to persons injured by an escaped prisoner when it is proved that the custodian was negligent in his management of the prison or handling of the prisoner, that the negligent breach of the custodian's duty facilitated the prisoner's escape, that the harm complained of was caused in fact by the prisoner during the course of his escape, and that the risk of that particular harm to the particular plaintiff falls within the scope of the custodian's duty. See Brown v. American Druggists' Ins. Co., supra, citing Reid v. State through Dept. of Corrections, supra, citing, among other cases, Webb v. State of Louisiana, 91 So.2d 156 (La.App. 1st Cir.1956).
The failure of the deputy to reasonably observe Weeks has been noted. We find that this failure was a breach of the duty we have noted above.
Defendants contend that if the sheriff's duty of care was breached when Weeks escaped, the abduction of Mrs. Edwards and her son was too remote in time (two days) and place (20 miles) from the escape to be within the scope of the duty. We cannot agree.
We recognize, of course, that the custodian of a prisoner is not liable for all harms done to all persons by the prisoner who escapes custody because of the custodian's neglect. Improper emphasis has sometimes been placed on foreseeability or on the proximity of time and distance between the escape and the escapee's offense that caused injury to his victim. Neither controls resolution of the scope of duty question.
The proper question, regardless of foreseeability and of time and distance, is whether the offense occurred during, or as an integral part of, the process of escaping. LeBlanc v. State, through Dept. of Corrections, 393 So.2d 125, 128 (La.App. 1st Cir.1980, on rehearing), writ denied; Webb v. State, supra. Restated, the proper inquiry is how easily the risk of injury is associated with the duty that is sought to be enforced. See Finley, supra, at p. 843, quoting Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), citing Prosser.
The record supports the conclusion that the abduction was an integral part of Weeks' escape and was therefore within the scope of the sheriff's duty. When Weeks abducted Mrs. Edwards and her son, law enforcement officers were actively searching for him. Weeks' photograph was in the newspaper Mrs. Edwards saw at the Jonesboro nursing home when she arrived there 13 hours after the abduction. Weeks' conduct during the course of the abduction (changing his appearance, his clothes, driving on back roads, avoiding any lengthy stop until in a secluded area after dark, changing to a different vehicle) also indicates he was reacting to the publicized manhunt.
Weeks abducted Mrs. Edwards and her son "while attempting to perfect [his] escape." Webb, supra, at p. 162. As Mrs. *650 Edwards explained, Weeks was "trying to give himself some time," as well as put distance between himself and his potential captors by gaining transportation and abducting and thus preventing Mrs. Edwards and her son from reporting his changed appearance and his theft of her car and her husband's pistol. Fortunately, he chose to abduct and not to kill.
We readily and easily associate this risk of injury to Mrs. Edwards and her son with the duty of a custodian to safeguard his prisoner for the protection of the public, notwithstanding that the abduction occurred on the second day of, and 20 miles from, the negligently-facilitated escape.
Enforcement of the sheriff's duty is not here attenuated. Defendants do not suggest reasons, other than remoteness in time and distance, why the duty should not be enforced. We affirm the trial court's judgment that defendants are liable in damages.

DAMAGES
The trial court found that Mrs. Edwards suffered great emotional distress, fearing for her son's safety as well as her own, during their 13-hour detention by Weeks. She persuaded Weeks to stop making sexual advances after he forced her to take off her shorts and touched her "all over."
Mrs. Edwards had insomnia, headaches and a "nervous stomach" for a several weeks after she returned home, the physical symptoms of which were treated by her family doctor. She was professionally counseled for six months for anxiety, which recurred in intensity when she learned of Weeks' two subsequent escapes, one from the Ouachita Parish Jail about a year after her abduction and the other from Angola. She has been disoriented when driving at night, and is afraid to drive or stay home alone.
The trial court found that Justin suffered some periods of extreme fright during the abduction, notwithstanding his mother's efforts to keep him calm. Mrs. Edwards testified that Justin asked her if he was ever going to see his dad again when Weeks took them into the wooded area for the night. He had nightmares after they returned home and also became upset when he heard that Weeks had escaped again.
Mr. Edwards arrived home from work several hours after the abduction and did not know where his wife and son were until Mrs. Edwards called him about ten hours later. He and his wife testified that their sexual relationship was "nonexistent" for several months after the abduction. Mrs. Edwards said, "I have not had any emotions or any feelings for my family at all except for Justin." Mr. Edwards also described the change in their marriage relationship:
I feel like there's not the same feeling between the two of us and that she probably has a distrust of all men, including me, because of what happened to her. She just doesn't seem ... it doesn't seem that she wants to have ... to spend time or to have anything to do with me the way it was before this happened.
From the evidence presented, the trial court found it unlikely that the damage and difficulties caused by the abduction would be permanent.
Defendants contend the $23,000 damage award to Mrs. Edwards is excessive and the awards of $7,000 for Justin's emotional distress and $5,000 for Mr. Edwards' loss of consortium are "unsubstantiated and unwarranted." We do not agree. There is clearly a factual basis in the record for each award, and we find no abuse of discretion in the amounts awarded.

DECREE
At defendants' cost, the judgment is AFFIRMED.
SEXTON, J., dissents and assigns written reasons.
SEXTON, Judge, dissenting.
Other than Brown v. American Druggists Insurance Company, 476 So.2d 881 (La.App. 2d Cir. 1985), writ denied, 479 So.2d 365 and 366 (La.1985), in which I dissented from this court's failure to grant *651 a rehearing, Webb v. Louisiana, 91 So.2d 156 (La.App. 1st Cir. 1956), is the only case that I have found in which the harm the victim sustained from a jail escapee was held to be within the scope of the duty which the jailer breached in allowing the escape. In Brown, the victims were only a "few miles" from the jail and the incident occurred only a "few hours" after the escape.
In the instant case, the plaintiff's encounter with the escapee began two days after the escape and occurred some twenty miles from the point of escape. Because I am of the view that the risk of harm in the instant case is also too remote from the duty owed, I respectfully dissent.