673 So.2d 1298 (1996)
Robert W. DAVIS, Jr., et al
v.
David PURYEAR, et al.
No. 95-CA-1637.
Court of Appeal of Louisiana, Fourth Circuit.
May 1, 1996.
*1299 Lawrence D. Wiedemann and Karl Wiedemann, New Orleans, for plaintiffs.
Gregory C. Weiss and Kathryn M. Caraway, Weiss & Eason, L.L.P., New Orleans, for defendants.
Before ARMSTRONG, WALTZER and LANDRIEU, JJ.
ARMSTRONG, Judge.
This is an appeal by the defendants, several State of Louisiana mental health institutions and several of their physician employees, from a judgment for the plaintiffs in this wrongful death case. The trial court found the defendants liable because a psychotic patient, committed to a state mental institution, escaped and, perhaps made violent by medications imprudently prescribed for and supplied to him by State mental health physicians, committed a rape and murder of a young woman in the presence of her small children. The defendants appeal the finding of liability on the asserted grounds that (1) they did not deviate from the applicable standard of care and (2) they owed no duty of care to the victim. The plaintiffs have answered the appeal to seek additional damages. We amend the judgment to award additional damages to one of the plaintiffs and otherwise affirm.
David Puryear had a years-long history of severe mental illness. In the record, he is variously described as a chronic psychotic and a chronic paranoid schizophrenic. On February 6, 1984, he was taken to the Orleans Parish House of Detention on a charge of criminal trespass. A psychiatrist examined him there and issued a physician's emergency certificate to commit Puryear to a state mental institution, Southeast Louisiana Hospital ("SELH"), located in Mandeville, Louisiana.
Puryear was transported to SELH where he was admitted by a SELH non-psychiatrist physician, defendant Robert L. Ford, who diagnosed him as a paranoid chronic schizophrenic. At some point, Puryear was placed *1300 under the care of a SELH psychiatrist, defendant Dr. Audrey Fontnote, who also diagnosed him as a paranoid chronic schizophrenic.
SELH's records show that SELH immediately was aware that Puryear had been committed to another state mental health hospital, East Louisiana Hospital ("ELH"), on eight previous occasions. Yet neither Dr. Ford, Dr. Fontnote nor anyone else at SELH requested ELH's records of Puryear's confinement and treatment at ELH. Nor, so far as the record reflects, did Dr. Ford, Dr. Fontnote or anyone at SELH telephone ELH to discuss Puryear.
While at SELH, Puryear executed a voluntary commitment. Under this procedure, he had to give SELH seventy-two hours written notice if he wanted to be released. SELH had the right to hold Puryear, and to return him to SELH if he left, until seventy-two hours after Puryear gave written notice that he wanted to be released. Puryear never gave the written notice that he wanted to be released so, at all times, SELH had the right to hold Puryear and to return him to SELH if he left.
An absolute dearth of physicians' entries in Puryear's SELH record indicates that he was very seldom seen by Dr. Fontnote or any other psychiatrist or Dr. Ford or any other doctor at SELH. Thus, there was little observation of Puryear's affliction by psychiatrists or other physicians while he was at SELH.
At SELH, Puryear was treated with an anti-psychotic medication, Prolixin, and another medication, Artane, that is used to deal with side effects of anti-psychotic medications. The use of Prolixin was discontinued on March 22, 1984, apparently because of Puryear's complaints of side effects, but the use of Artane was not discontinued. Apparently, the Artane was continued by oversight. After three or four days, the Prolixin would have been out of Puryear's system, so there would be no reason to continue the Artane.
Artane is subject to abuse and is addictive. Especially if abused, it can cause or aggravate disorientation and psychosis and can cause violence. Because it can produce a "high" or state of excitement, it is abused as a street drug. The fact that Artane is subject to abuse is common knowledge among psychiatrists. Because Artane can cause violence, some psychiatrists view it as a dangerous medication that should not be used in psychiatry. Also, other drugs can be used, instead of Artane, to counter the side effects of anti-psychotic medication.
Puryear was given a "grounds card" at SELH which allowed him to go about the grounds of SELH without supervision. Thus, there was no rigorous confinement of or tight security with respect to Puryear. At one point, Puryear was transferred to an open ward. However, because he refused to take a prescribed medication, his transfer to an open ward was revoked. Nevertheless, his grounds card was not revoked.
On April 8, 1984, Puryear was discovered to be missing. Apparently, he, in SELH's terminology, "eloped" (i.e. escaped) on April 7 or 8, 1984. It appears that his elopement was discovered at 8:40 a.m. on April 8, 1984 but was not reported to his family or to the police until a shift change at about 2:45 p.m. that same day.
About 3:15 a.m. on April 9, 1984, Puryear appeared at the emergency room of Charity Hospital in New Orleans, which is also a State institution. He reported that his medication, Artane, had been stolen and he sought replacement Artane. No psychiatric workup of Puryear was done. Nor was Puryear sent to Charity Hospital's Crisis Intervention Unit, which is a mental health unit. Instead, the physician on duty in the emergency room gave Puryear a prescription for one hundred 5 milligram tablets of Artane plus three 100 tablet refills. The usual maximum dosage of Artane is three 5 milligram tablets a day, so the prescription was equivalent to about a four-month supply of Artane. This was done despite the fact that Puryear had been seen at Charity Hospital on previous occasions, and his record contained a notation that he was suspected of Artane abuse. There also was a notation of a previous similar occasion when Puryear had claimed that his Artane had been lost or stolen.
*1301 Later in the day, on April 9, 1984, Puryear appeared at Chartres Mental Health in New Orleans, another State mental health facility, where he was seen by a psychiatrist, Dr. Laird. Apparently, Puryear again was seeking Artane as Dr. Laird dispensed to him six 5 milligram Artane tablets. That would be the maximum dosage for two days.
While Puryear was there, Chartres Mental Health contacted SELH about him. Through this contact, Dr. Laird sought to have Puryear readmitted to SELH. However, SELH responded, incorrectly, that, because Puryear had been at SELH on a voluntary commitment, he could not be brought back to SELH. There was no direct conversation between Dr. Laird and Dr. Fontnote or any other psychiatrist at SELH. Instead, the contact was by a telephone conversation between social workers at the two institutions. The trial court noted on the record during the trial that the records of SELH had been supplemented, after the murder, to reflect possibly greater communication with Chartres Mental Health than actually occurred.
The psychologist who performed the intake on Puryear at Chartres Mental Health put a handwritten note in the record describing extreme psychosis and ending: "Does he need commitment?" (It is not clear if the ending punctuation of that sentence is a question mark or an exclamation mark.) However, although Dr. Laird could have committed Puryear to Charity Hospital (presumably, the Crisis Intervention Unit) by a Physicians Emergency Certificate, he did not do so. That was the last chance the State's mental health system had to regain control of Puryear prior to the rape and murder of Valerie Davis.
The next day, April 10, 1984, Puryear went to the home of Robert and Valerie Davis in Baton Rouge. Puryear did not know the Davises, but the house, which was rented by the Davises, previously had been the home of Puryear's sister. Robert Davis was at work but Valerie Davis and her eighteen month and three month old sons were at home. Puryear raped and murdered Valerie Davis. When Robert Davis returned home from work, he found his wife beaten, strangled and stabbed to death. His children were still present and physically unharmed. Soon thereafter, Puryear, who had been arrested and charged with the crime, told Dr. Silva, the psychiatrist who was evaluating him for the court in which those criminal proceedings were pending, that he had been "high" on Artane and Benadryl when he raped and killed Valerie Davis.
Puryear's ELH records, which SELH did not request from ELH, show the following: Puryear twice was judicially committed as being dangerous to himself or others. He was committed on physicians' emergency certificates as being dangerous to himself or others on four occasions. Puryear is described by ELH psychiatrists as "currently violent" and "dangerous to others." The ELH records show a pattern of violence and threats of violence by Puryear, although nothing so severe as the violence of the present case. In particular, Puryear fought with his father, kicking him in the head, according to Puryear, "until he acted retarded." He also threatened his mother with a knife. When Puryear was living at home, instead of ELH, the members of his family barricaded their bedroom doors at night because they feared he would attack them in their sleep. However, because Puryear set fires in the house, they left their bedroom windows open for quick escapes. Puryear's history of threatened violence was not limited to his family. In particular, he had a "preoccupation with sexual material coupled with a great deal of anger toward amoral females." He believed that "a man would be justified in beating a woman who sins" and he "felt that he could murder a pregnant woman." He had "eloped" from ELH six or seven times. The ELH records also show that Puryear was an Artane abuser. Because SELH did not request the ELH records, none of this information was known to SELH.

THE STANDARD OF CARE
On appeal, the defendants argue that the evidence does not show that they deviated from the standard of care of mental health institutions and professionals. There are three preliminary matters, one raised by the plaintiffs and two by the defendants, that *1302 bear on the analysis of whether the defendants deviated from the standard of care.
The plaintiffs point out that neither Dr. Ford nor Dr. Fontnote from SELH, nor anyone at all from Charity Hospital, testified and that no explanation was offered for their failure to testify. Thus, the plaintiffs argue, citing Keller v. Schwegmann Brothers, Inc., 402 So.2d 724 (La.App. 4th Cir.1981), and Ruthardt v. Tennant, 215 So.2d 805 (La. 1968), that an adverse inference, as to what those witnesses would have testified, must be drawn against the defendants. However, we need not address that issue, because there is abundant testimony and documentary evidence in support of the plaintiffs' claims of negligence.
Second, the defendants argue, citing the Louisiana Mental Health Law, La.R.S. 28:63, that a local, as opposed to national, standard for physicians is applicable to this case. The defendants' point is that one of the plaintiffs' psychiatric expert witnesses, Dr. Norman Levy, is from New York. However, several other psychiatrists testified and all of them are from the greater New Orleans area.
One of these local psychiatrists, Dr. Robert Davis, was an expert witness for the plaintiffs. Dr. Davis is the father and grandfather of the plaintiffs and the father-in-law of the deceased. As the trial court properly noted, this family relationship would be evidence of bias, which goes to the trial court's consideration of the weight to be given to his testimony, but does not disqualify him from testifying (and the defendants do not contend otherwise).
Also testifying was Dr. Francisco Silva, who was Puryear's treating psychiatrist before the chain of events involved in this case occurred and, at the request of the court in which criminal proceedings were brought, evaluated Puryear soon after the crime. Dr. Silva is not a defendant and no party has suggested that he might be at fault in this case. Thus, as a prior treating physician who was familiar with Puryear, and who evaluated Puryear soon after the crime, Dr. Silva is in a good position to opine as to various aspects of this case. As he is not accused of any fault, he is likely to be objective in his testimony.
Another psychiatrist who testified was Dr. Gary Snead. He was the Chief Executive Officer at SELH at the time of the events in question, but he did not personally treat Puryear, and he is not a defendant. A fourth psychiatrist who testified, Dr. Doris LeBlanc, was retained as an expert witness by the defendants.
Drs. Davis, Silva, Sneed and LeBlanc all gave expert opinion testimony on various issues in the case. As will be discussed below in connection with the consideration of specific issues of negligence, the expert testimony of these four psychiatrists amply supports the plaintiffs' allegations and the trial court's finding of negligence on the part of the defendants. In fact, some of the testimony most supportive of the plaintiffs' allegations came from Dr. Sneed, the CEO of SELH, and even the testimony of the defendants' expert witness, Dr. LeBlanc, is damaging to the defendants. Thus, even if Dr. Levy's testimony is given no consideration whatsoever, there is a plethora of highly probative psychiatric testimony from local psychiatrists.
The defendants also raise an issue as to the standard of appellate review of the trial court's findings of fact. In particular, the defendants argue that, because most of the witnesses testified by deposition rather than live at trial, this court is free to conduct a de novo review of the evidence rather than applying the clearly wrong-manifest error standard of review. That is incorrect. "The manifest error-clearly wrong standard must be applied even where the evidence before the trier of fact consists solely of written reports, records and depositions." Alexander v. Pellerin Marble & Granite, No. 93-C.1698 (La. 1-14-94), 630 So.2d 706, 710. Thus, regardless of our own view of the evidence, we may not disturb the trial court's findings of fact so long as they are reasonable in light of the record as a whole. Alexander v. Pellerin, supra; Ambrose v. New Orleans Police Dept. Ambulance Service, Nos. 93-C-3099, 93-C-3110, 93-C-3112 (La. 7-5-94), 639 So.2d 216, 220-21; Stobart v. State, DOTD, 617 So.2d 880 (La.1993); Rosell *1303 v. ESCO, 549 So.2d 840 (La.1989), writ denied, 561 So.2d 105 (La.1990).
The plaintiffs argue that there were a number of ways in which the defendants deviated below the standard of care for psychiatrists and mental health institutions. It is apparent that some of these different aspects of the defendants' negligence interacted with one another. Also, although several different institutions and individuals were involved in the negligence, all of them were part of the State of Louisiana's mental health care system and the State, the party actually cast in judgment below, is answerable for their negligence.
The plaintiffs' allegations of the defendants' deviations from the standard of care, set out in roughly chronological order, are as follows:
1. SELH's using a non-psychiatrist, Dr. Ford, to admit Puryear, make the initial diagnosis, etc.
2. SELH's failure to request ELH's records of Puryear.
3. Infrequent observation of Puryear by SELH psychiatrists.
4. SELH's discontinuance of Puryear's anti-psychotic medication.
5. SELH's administering Artane to Puryear and continuing Artane more than 3 or 4 days after discontinuing anti-psychotic medication.
6. SELH's giving Puryear a grounds card and not taking anti-elopement measures as to Puryear.
7. SELH's delay in reporting Puryear's elopement.
8. Charity Hospital's giving Puryear no psychiatric work-up and giving a prescription for a large amount of Artane.
9. Lack of direct contact between the psychiatrists at Chartres Mental Health and SELH.
10. SELH's incorrectly telling Chartres Mental Health that Puryear could not be referred to SELH.
11. Chartres Mental Health's giving Artane to Puryear.
12. Failure of Chartres Mental Health to have Puryear committed to Charity Hospital.
The record contains ample factual testimony and documentary evidence to support findings that the twelve events alleged by the plaintiffs, as detailed above, in fact occurred as alleged. The record also contains ample expert psychiatric testimony to support findings that these twelve events constitute deviations from the standard of care for psychiatrists and mental health institutions. Because we believe that the negligence relating to failure to obtain ELH records and the failure to prevent Puryear's elopement are the most important in terms of legal causation of the damages, we will focus our analysis of the evidence on those points.
The issue of SELH's failure to request Puryear's records from ELH is particularly acute given the alarming information contained in those records and the impact that information should have had in deciding whether to take measures to prevent Puryear's elopement. Dr. Davis testified that the failure to request the ELH records was a deviation from the standard of care. In fact, he testified that it would be "standard procedure" to have requested them. Dr. Silva testified that psychiatrists usually try to get patients' records of previous hospitalizations. In general, with respect to this issue, none of his testimony was inconsistent with Dr. Davis' opinion. Dr. Sneed testified that a psychiatrist would want to know a patient's history from eight previous admissions. He also testified that, when he was CEO at SELH, which was at the time of the events in question, SELH psychiatrists were encouraged to request records of patients' previous hospitalizations. In general, with regard to this issue, none of his testimony was inconsistent with Dr. Davis' opinion. Dr. LeBlanc, the expert witness retained by the defendants, did not deny that one should requests records of a patient's prior hospitalizations. In short, the expert testimony was uniform that the failure to request ELH's records was a deviation from the standard of care.[1]
*1304 As to the lack of any effort to prevent Puryear's elopement from SELH, the key fact is that SELH did not have the benefit of the ELH records or, so far as the record reveals, even a telephone conversation with ELH. Thus, SELH did not know of Puryear's dangerousness nor his history of elopement from ELH. Dr. Davis testified that, if SELH had obtained Puryear's ELH records (as SELH should have) and had thus known of Puryear's dangerousness and/or his history of elopement, then the standard of care would have required SELH to take anti-elopement measures against Puryear. Also if SELH had learned of Puryear's dangerousness and his history of elopement (again, which is what SELH should have learned), then rigorous measures should have been instituted to confine Puryear. Instead, because of SELH's self-imposed and unjustifiable lack of knowledge of Puryear's dangerousness and history of elopement, no such rigorous confinement measures were taken. In fact, Dr. Davis testified that based upon his review of SELH's records, SELH did not take any anti-elopement measures against Puryear. Instead, it is undisputed that Puryear was given a grounds card which allowed him to go about the grounds of SELH unaccompanied. Dr. Sneed, the CEO of SELH at the time in question, conceded in his testimony that Puryear's grounds card was not revoked even when his transfer to an open ward was cancelled because he would not take his medication. Dr. Sneed testified that, at the time of his elopement, Puryear's prognosis was not good, and that he was not about to be discharged.
A point that is relevant to both the failure of requesting the ELH records and consequent failure to take anti-elopement measures against Puryear is that Puryear's history of violence and threats of violence was a predictor, an indication, that he might be violent in the future. Dr. Davis testified that the ELH records as a whole depict Puryear as a person with violent tendencies who has not only threatened violence but has instituted acts of violence against himself and others. Dr. Sneed conceded in his testimony that prior behavior of a psychotic is important as to whether he will be a risk to others. In particular, Dr. Sneed conceded that "dangerousness is best predicted by things that happened in the past" and that if a psychotic has manifested violent or suicidal tendencies in the past it is "more likely" that he will commit violent acts in the future. He also testified that, viewing the ELH record as a whole, one could "certainly say" Puryear was "violent." In view of Puryear's history as set out in the ELH records, Dr. Sneed testified "you would think that someone who had that past history would have a greater propensity to do what he apparently did."
Thus, the failure to obtain the ELH records was crucial because, had SELH (and, through SELH, Chartres Mental Health) known of Puryear's violent history, the likelihood of future violence by Puryear would have mandated rigorous anti-elopement procedures. Consequently, the failure to take anti-elopement measures, a product of SELH's unjustifiable ignorance of Puryear's ELH record, was also a deviation from the standard of care.
The plaintiffs stress that the supply of Artane of Puryear by the defendants was a serious deviation from the standard of care caused by the failure to request the ELH records. That is correct, and Puryear was "high" on Artane and Benadryl at the time of his crime, but there are substantial questions as to whether he was under the influence of Artane supplied by the defendants. There is no evidence as to whether Puryear had filled the Charity Hospital prescription. There is no evidence as to when Puryear took the Artane supplied to him by Chartres Mental Health. Also, there is a report of the Baton Rouge Sheriff (of highly debatable admissibility) *1305 relating a statement by Puryear that he obtained Artane and Benadryl from a Dr. Tessier in Baton Rouge on the day of the crime. Because of these concerns, we prefer to base our affirmance of the trial court's finding of negligence upon the failure to request the ELH records, and the consequent failure to prevent Puryear's elopement, rather than upon the supply of Artane.

THE DUTY OF THE DEFENDANTS
The defendants argue that they owed no duty to Valerie Davis or her family and, therefore, cannot be held liable even if they deviated from the standard of care. This issue must be resolved because it is part of the duty-risk analysis used to determine whether to impose liability in a tort case. The duty-risk analysis is a four-prong inquiry:
1. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e. was it a cause-in-fact of the harm which occurred?
2. Did the defendant owe a duty to the plaintiff?
3. Was the duty breached?
4. Was the risk, and the harm caused, within the scope of the protection afforded by the duty breached?
Roberts v. Benoit, 605 So.2d 1032 (La.1991); Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).
"The duty owed by a defendant to protect against injury is a question of law and is decided by the trial court in the first instance and the appellate court on review." Wiggins v. Ledet, No. 94-CA-0485 (La.App. 4th Cir. 9-29-94), 643 So.2d 797, 800-801. Thus, we must determine whether the defendants' duty to conform to the standard of care was a duty owed to Valerie Davis and her family.
The defendants cite the First Circuit cases of Graham v. State, 354 So.2d 602 (La.App. 1st Cir.1977), and Jacoby v. State, 434 So.2d 570 (La.App. 1st Cir.1983) writ denied, 441 So.2d 771 (La.1983). In Graham and Jacoby, psychotic patients escaped from State mental hospitals and then, in apparently random acts of violence, stabbed the plaintiffs. In each case, the First Circuit held that, even if the State mental hospitals were negligent in having allowed the escapes, they owed no duty to the plaintiffs and so could not be found liable.[2]
Both Graham and Jacoby looked to prior caselaw dealing with wrongs committed by escaping or escaped prisoners. That prior caselaw is Frank v. Pitre, 353 So.2d 1293 (La.1977), Green v. State, 91 So.2d 153 (La. App. 1st Cir.1956), and Webb v. State of Louisiana, 91 So.2d 156 (La.App. 1st Cir. 1956).
The Green and Webb cases were decided by the same court, the First Circuit, on the same day, and reached opposite results. In Green, the prisoner had completed his escape and then, later, caused an automobile accident. The Green result was no liability. In Webb, the prisoner stole a gun and, while still in the process of escaping, shot the plaintiff. The Webb result was liability. Thus, the rule was laid down in Green and Webb that, when a prisoner is negligently allowed to escape, then the State is liable for wrongs committed by the prisoner during the escape but not for wrongs committed by the prisoner after the escape has been accomplished. The Supreme Court, in the Frank case, dealt with a situation in which a released prisoner committed a crime. The Supreme Court discussed the Green and Webb decisions with apparent approval and found no liability in Frank.
The First Circuit's Jacoby and Graham decisions simply equate escaped patients of state mental hospitals with escaped prisoners. Because, in each of those cases, the escaped patients committed wrongs after their escapes were already completed, the First Circuit, citing Green, Webb and Frank, found no liability. However, we believe that it is an error to equate the escaped patients of state mental health hospitals, as in Jacoby, Graham or the present case, with escaped prisoners as in the Green, Webb and Frank cases. In order to explain why we so believe, *1306 it is necessary to study the reasoning of the Green case, which was quoted at some length with apparent approval by the Supreme Court in Frank, and we do that immediately below.
The key passage in Green, quoted in Frank, is as follows:
An institution's duty to restrain a convicted criminal is not based upon the purpose of protecting the general public from all harms that the prisoner might inflict if he is allowed to escape. A convicted person may be as dangerous on the day of his release as he was on the first day that he was confined, although the institution may still be under a legal duty to detain or to release him. There is no more reason for the State to be civilly responsible for the convict's general misconduct during the period of his escape than for the same misconduct after a legal release, unless there is some further causal relationship than the release or escape to the injuries received.
Green, 91 So.2d at 155 (emphasis added) (quoted in Frank, 353 So.2d at 1295).
The point made by Green is that criminal sentences are for a finite length (except life sentences) and determine the maximum length of time that the convicted person can be held. When that time is up, the convicted person must be released no matter how dangerous he is at that time. From that, one can conclude, regardless of one's view as to the purpose(s) of imprisonment (retribution, deterrence, etc.) that the confinement of convicted persons so as to prevent their harming the general public is not the principal purpose of imprisonment. If it were, then there would be no specified length of the prison sentence, and the timing of the release would be based upon a determination that the convicted person is no longer dangerous.
The Frank case itself dealt with a crime committed by a jail inmate incarcerated while awaiting trial. The Supreme Court pointed out that the purpose of such incarceration is to insure that the accused will appear for trial and that the accused can be released on bail. Thus, the Supreme Court concluded that "we cannot agree that one of the main purposes of the incarceration [while awaiting trial of the accused] was to protect the public from intentional injury by him." 323 So.2d at 1295. Obviously, if the purpose of incarceration pending trial were to protect against dangerousness of the accused, then no bail would be allowed.
But the purposes of committing a person to a mental health hospital are wholly different from incarceration in a jail or a prison. Admission to a mental health hospital in general is, of course, usually for the purpose of treatment. However, commitment to a mental health hospital pursuant to the Mental Health Law, La.R.S. 28:1 et seq., generally is based upon one or more of the three statutorily specified grounds which are: (1) the person is "gravely disabled" (i.e. unable to care for oneself); (2) the person is a danger to himself or herself; and (3) the person is a danger to others. La.R.S. 28:52-54. These grounds are indicative of the purposes of commitment to a mental health hospital: to care for the committed person and to prevent the committed person from hurting himself or herself or others.
When a person is or should be committed to a mental hospital because the person is a danger to others, then the very purpose of the actual or needed commitment is the prevention of harm to others. Thus, in the case of such an actual or needed commitment, the reasoning of Green, Webb and Frank is plainly inapplicable and, we think, the no-duty rule of those cases is equally inapplicable.
At the time he eloped, Puryear was at SELH on a voluntary commitment, La.R.S. 28:52, rather than a physician's emergency certificate, La.R.S. 28:53, or a judicial commitment, La.R.S. 28:54, but that does not alter the analysis. SELH had the legal power and right to hold Puryear until the elapse of seventy-two hours after Puryear gave a written request to be released. La.R.S. 28:52. If Puryear had given such written notice, and SELH had known what it should have known about Puryear's dangerousness (i.e., the ELH records), then SELH certainly could have reacted to Puryear's written notice by committing him involuntarily, La. R.S. 28:53-54, on the ground that he was dangerous to others. Thus, if SELH had *1307 known what it should have known about Puryear's dangerousness (i.e. the ELH records), then the purpose of Puryear's commitment at SELH, whether voluntary or involuntary, would have been to protect others from the danger presented by Puryear.
However, specifically, the defendants argue that, while the commitment statutes, La.R.S. 28:52-54, give them the legal right and power to detain a dangerous patient, those statutes do not impose an obligation on the defendants to do so. As the defendants' brief puts it, the defendants have the "option" to detain a dangerous patient. Nonetheless, we believe that the defendants have a duty to exercise their legal right and power to detain, and take reasonable care to prevent the escape of, dangerous patients. In reaching that conclusion, we turn first to the Restatement of Torts, Second. The Supreme Court has indicated that, with due regard for the Louisiana Civil Law's flexible approach to delictual liability, the Restatement may be looked to for guidance. See White v. Monsanto Co. 585 So.2d 1205 (La. 1991).
Section 319 of the Restatement provides:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
Illustration 2 to Section 319 states:
A operates a private sanatarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and harms C. A is subject to liability to C.
Obviously, under the Restatement's view, the defendants owed a duty to Valerie Davis and her family.
There are a number of cases from various jurisdictions which find a duty owed by psychiatrists and/or mental health hospitals to third persons with respect to dangerous patients. Certainly the best known of such cases is the California Supreme Court's decision in Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In Tarasoff, a patient told his psychiatrist that he was going to kill a specific young woman when she returned from a vacation abroad. The psychiatrist took some abortive measures in response to this threat, but did not make any effort to warn the young woman or her family, and ultimately did nothing of substance to guard against the patient's carrying out his threat. The patient did kill the young woman.
The Tarasoff defendants argued, among other things, that psychiatrists owe no duty of care to third persons with respect to dangerous patients, but the Court rejected that view. The Tarasoff holding is sometimes misunderstood and misstated to be that (a) if a patient makes a threat against a readily identifiable victim, then (b) the psychiatrist has a duty to warn that potential victim. In fact, Tarasoff's much broader holding is that (a) when a psychiatrist should know that a patient is dangerous to others (whether or not a threat is made), 551 P.2d at 340, 345 then (b) the psychiatrist has a duty to exercise reasonable care to guard against such danger to others by taking "one or more various steps" (which might or might not include a warning to a third party). Id. Thus, the holding of Tarasoff, when properly understood, is persuasive authority for finding a duty of reasonably care owed by the defendants in the present case to Valerie Davis and her family.[3]
Of particular relevance to the present case is Tarasoff's statement that "a hospital must exercise reasonable care to control the behavior of a patient which may endanger other persons.... A mental hospital may be liable if it negligently permits the escape or release of a dangerous patient." 131 Cal.Rptr. at 23 and n. 7. 551 P.2d at 343 and n. 7.[4]
*1308 A later decision of the California Supreme Court at least implicitly suggests that the psychiatrist's duty of care recognized in Tarasoff exists only when there is a threat made to a "readily identifiable" potential victim. Thompson v. Alameda County, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980) (citing Mavroudis v. Superior Court, 102 Cal.App.3rd 594, 162 Cal.Rptr. 724 (1980)). However, the only issue of duty addressed in Thompson was the narrow one of whether there is a duty to warn in the context of "nonspecific threats of harm directed to nonspecific victims." 167 Cal.Rptr. at 77, 614 P.2d at 735. The Thompson court reasoned, among other things, that warnings given to the general public would be of little use in a society already accustomed to fear of crime.
However, as we have pointed out above, Tarasoff did not recognize a narrow duty to warn but, instead, recognized a broader duty of "reasonable care" under the circumstances presented. If those circumstances are such that a warning is not the appropriate precaution, because of a lack of a readily identifiable victim or otherwise, the duty of reasonable care is not abrogated. Instead, the duty of care requires that whatever other precaution is available and necessary be taken. Thus, as to situations in which a warning is not the appropriate precaution (such as the present case), Thompson is not persuasive.[5]
In Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185 (D.Neb.1980), the Veterans Administration was sued for failing to detain or initiate civil commitment proceedings against a mentally-ill patient. The patient, in an act of random violence, fired a shotgun into a night club killing one plaintiff and wounding another. The defendant argued that, under the Tarasoff rule, the duty to protect third parties against dangerous patients is limited to giving warnings. The Lipari court rejected that argument and held that, under Tarasoff, "the nature of the precautions to be taken depends on the circumstances" and the Lipari court adopted that position as its own. 497 F.Supp. at 193. The Lipari defendant also argued that the duty of care is owed only to readily identifiable potential victims of the patient. The Lipari court rejected any requirement of a readily identifiable victim and adopted the position of prior caselaw which "required only that the doctor reasonably foresee that the risk engendered by his patient's condition would endanger other persons." 497 F.Supp. at 194.
In Bradley Center, Inc. v. Wessner, 250 Ga. 199, 296 S.E.2d 693 (1982), the defendant mental health hospital released a patient on a weekend pass and, while out of the hospital on that pass, the patient shot and killed his wife and her paramour. The defendant hospital argued that it had no duty to protect third persons against harm by dangerous patients. The Georgia Supreme Court rejected that argument and held that "where the course of treatment of a mental patient involves an exercise of control over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient." 296 S.E.2d at 695-96. The Bradley court quoted and relied upon Section 319 of the Restatement of Torts, Second, and Illustration 2 of that section, which we quoted above. See also: Mayer v. United States, 774 F.Supp. 1114 (N.D.Ill. 1991) (court adopts Restatement of Torts, Second, Section 319 as to mental health hospital's release of patient who shot plaintiffs' decedent).
In Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983), a patient, shortly after being released from a mental health hospital where he was being treated for psychosis caused by drug abuse, injured the plaintiff in a random automobile accident. It appeared that the accident was caused by the patient's continued drug abuse. The plaintiff argued that *1309 the defendants breached a duty to have the patient judicially committed. The Washington Supreme Court addressed the issue of whether such a duty existed in the absence of a readily identifiable potential victim, adopted the approach of the Lipari court and held that the psychiatrist "incurred a duty to protect anyone who might forseeably be endangered by [the patient's] drug-related mental problems." 671 P.2d at 237.
We adopt the position of Section 319 of the Restatement, Tarasoff (as properly understood), Lipari, Bradley and Petersen. The defendants in the present case had a duty to exercise reasonable care to guard against harm to third persons by Puryear. The duty was not limited to the giving of warnings but, instead, extended to whatever measures were necessary to constitute reasonable care under the circumstances. The duty was not owed only to readily identifiable potential victims of Puryear (there were none) but instead extended to the public.[6]

DAMAGES
The trial court fixed the damages for the survival action, measured by Valerie Davis' suffering prior to her death, at $100,000.00. The plaintiffs request that we increase that award to $500,000.00.
The trial court fixed the damages for the wrongful death claim of Robert W. Davis, Jr. (Valerie Davis' husband), measured by his loss from the death of Valerie Davis, at $250,000. Mr. Davis requests that we increase that award to $500,000.00.
Appellate review of trial court awards of general damages is quite limited. We are not authorized to change a trial court's award of general damages simply because, in our opinion, a different award would be more appropriate. Instead, we may review the trial court's award of general damages only for an abuse of discretion. Moreover, the trial court's discretion as to general damages awards is "vast." Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993).
Valerie Davis' suffering before death, and Robert Davis, Jr.'s loss from the death of his wife, were indeed great. In the law's scheme of awarding money damages for such suffering and loss, very substantial awards are warranted and the trial court did make very substantial awards. Regardless of whether we would have awarded the same amounts if the matter were presented to us originally, we cannot conclude that the trial court abused the "vast" discretion that it has in this area. We must respect the division of function between the trial and appellate courts that is provided for by Youn and Theriot.
The trial court did not award any Lejeune damages to Valerie Davis' children, Robert W. Davis, III and Justin B. Davis, because of their very young ages (eighteen and three months, respectively) at the time of their mother's death. The plaintiff requests that we award the two children $150,000.00 each in Lejeune damages.
The trial court determined that the children should not be awarded any Lejeune damages, so we do not regard this as an issue of quantum of general damages subject to the Youn and Theriot abuse of discretion standard of review. Instead, it is an issue of fact and therefore subject to the clearly wrong-manifest error standard of review.
Lejeune damages are awarded, subject to certain conditions clearly met here, for mental trauma suffered by one who views an injury causing event. Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 570 (La. 1990). After the murder of their mother, and a consequent emotional incapacitation of their father, the two Davis boys lived with their grandparents, Dr. Davis and his wife, for two years. Thus, Dr. Davis was in a *1310 good position, both as grandfather and psychiatrist, to observe the two boys.
Dr. Davis testified that there was no doubt that the older boy, Robert, III, had witnessed the murder of his mother. Dr. Davis expressed concern that Robert, III had been affected in a long-term manner by the event. He explained that, for example, Robert, III would grab knives when he became angry and that this was related to the stabbing death of his mother. From Robert Davis, Jr.'s testimony about the scene of the murder upon his arrival there, it appears possible that Justin did not witness the murder. At any rate, there is no evidence that Justin did witness the murder.
We believe that, in view of the evidence and the legal standard set out in Lejeune, Lejeune damages must be awarded to Robert, III. The trial court awarded $200,000.00 in Lejeune damages to his father, Robert Davis, Jr., so we believe that an award of $150,000.00 in Lejeune damages to Robert, III is appropriate.

CONCLUSION
For the foregoing reasons, we amend the judgment of the trial court to award $150,000.00 in Lejeune damages to Robert Davis, III and otherwise affirm.
AMENDED; AFFIRMED AS AMENDED.
WALTZER, J., concurs with reasons.
WALTZER, Judge, concurs with written reasons.
The trial court in the instant case rendered the following judgment and reasons therefor:
Judgment is rendered in favor of Robert W. Davis, individually, and as tutor for his children Robert W. Davis III and Justin B. Davis and against the State of Louisiana for the following:

Robert W. Davis, Jr.
 Survival action $ 33,333.00
 Lejeune damages $200,000.00
 Wrongful death $250,000.00
Robert W. Davis, III
 Survival action $ 33,333.00
 Wrongful death $250,000.00
Justin B. Davis
 Survival action $ 33,333.00
 Wrongful death $250,000.00

with interest from judicial demand and costs.
The mental health statutes are designed to encourage the least restrictive form of treatment. The hospital was encouraged by R.S. 28.52.2A to accept Puryear as a voluntary admission. Section B of the statute authorizes a hospital to hold a patient up to 72 hours after he decides to leave,[1] to allow the hospital time to commence the procedure for involuntary commitment if it believes such continued confinement is appropriate.
The rules imposed by the mental health law are for the benefit not only of the patient, but for the benefit of the community which might otherwise be exposed to harm. In this case, the system failed, miserably.
Assuming Southeastern Louisiana State Hospital was not guilty of culpable ignorance in failing to obtain the record form (sic) Jackson, or even make a phone call, Southeast should have been alerted to potential danger simply because it knew its patient had been hospitalized eight times at Jackson. When its patient eloped, its sense of impending danger should have been heightened. When Chartres called Mandeville to advise Puryear was here, the decision should have been to have Puryear returned in custody. Instead, the personnel made a legal error. They incorrectly believed they could not return the patient because he was under a voluntary admission. Such belief was plainly wrong.
Personnel at Chartres and Mandeville breached their duty to the community for which the State is liable. There are arguably *1311 several more failures, which need not be detailed.
Damages for conscious pain and suffering of Mrs. Davis is estimated $100,000.00. The emotional damage suffered by Mr. Davis upon discovering his wife's body was understandably enormous and long lasting. Limiting this element to the husband's emotional reaction caused by his perception of his wife's suffering, his Lejeune damages are assessed at $200,000.00. The children were too young to perceive their mother's suffering.
Wrongful death damages are estimated at $300,000.00 for Mr. Davis and $250,000.00 for each of the children.

I. Wrongful death claim of Robert Davis
Robert (hereinafter "Bobby") Davis requests that his wrongful death claim be increased from $250,000.00 to $500,000.00. I would do so. Bobby and Valerie Davis started dating in September of 1980 when he was a senior at the University of Alabama and they were married in May 29, 1981. They lived in Tuscaloosa while he finished his degree and their first child, Robert Whitney Davis III (hereinafter "Whitney") was born July 1, 1982. During their early marriage they lived in a house in Bay St. Louis owned by the parents of Bobby Davis while he attended UNO. Dr. Robert Davis and Joan Davis, Bobby's parents, testified that Valerie was very family oriented and fit very well with the Davis family. All of Bobby and Valerie's activities were family outings with the children. Bobby was Dr. and Mrs. Davis's first child to marry and Whitney was their first grandchild. Bobby Davis was employed by Merrill, Lynch in New Orleans and was transferred to the Baton Rouge office where he was tapped for the corporate protege program and then for the sales training program. His goal was to become a licensed broker and to that end, he would stay at work an hour late every day to study for the upcoming licensing exam. At this time, his wife Valerie had recently given birth to their second child, Justin Bryan Davis on January 14, 1984. Valerie had worked before Justin's birth and intended to return to her job after 6 months maternity leave. Justin was approximately 3 months old at the time of the incident and Whitney was 18 months old. Valerie and Bobby rented a house on Greenwell Springs Road in Baton Rouge from Kathy Franklin[2].
Bobby Davis called Valerie at least once a day during the work day. On April 9, 1984, Bobby called her and received no answer, however, Valerie had said she was going to cut the grass that day, so he assumed she was outside. He called her again and received no answer, but he assumed that she was out, because she had told him that she and a friend's wife might take the children on an outing. When he called a third time and received no answer, he "started getting a bad feeling" and went home. Upon arriving, his anxiety increased because although it was dusk, none of the lights were on in the house. Whitney, age 18 months, was unsupervised and sitting outside of the house, breaking his mother's cigarettes into little pieces one by one. From outside of the house, Bobby could hear Justin crying in his bedroom.
Because it was a judge trial and not a jury trial, the trial judge told Bobby Davis, who began having difficulties testifying at this point, that it was unnecessary for him to describe finding his wife's body.
Plaintiff's exhibits P-16 through P-24 indicate a neat and clean, color coordinated bedroom with a made bed and a laundry basket, as if someone had been folding clothes. On the floor is the smashed glass shade from a lamp, the lamp itself and scattered items indicating a struggle. Valerie put up a ferocious fight, evidenced by the scrapings taken *1312 from under her nails and the polish worn away at the edges. The struggle was ferocious enough that the footboard of the bed is broken and several of the spindles are missing. Also on the floor are a recently used tampon, a broken gold chain, Valerie Davis' clothes and the body of an attractive, well-groomed, young wife and mother with pretty pink nail polish and blond streaked hair. The body is bloodied indicating that she was struck about the head and face and the bruising indicates that she was choked by hands prior to her death.[3] There are human bite marks on her knee and one breast. The cord has been cut from the lamp and was used to strangle her. In addition, there are two knife wounds on her chest. Bizarrely, one small side table has been placed atop the scattered items and a child's toya doll's brass bed completely made with tiny linens has been placed on the table. This is the scene that hit Bobby Davis in the face and is forever imprinted in his memory upon returning from an ordinary day at work.
Bobby Davis was unable to function for a number of years. Immediately after the murder he moved in with his parents. He attempted to return to work at Merrill, Lynch, but was unable to do so. Joan Davis, Bobby's mother, testified that she was afraid they were going to lose Bobby too. He became suicidal and did not want to live without Valerie. He became an alcoholic and would disappear for weeks at a time. Often he would go to the house in Bay St. Louis where he and Valerie had lived. Two years after the murder, he remarried because he knew he could not take care of his children, but he was still in love with Valerie and his second marriage ended in two years. He entered the military and was in training and separated from his family for approximately another year, although he would visit them on weekends. Realizing that he had problems dealing with the murder of his wife, Bobby quit drinking and underwent therapy. Because he further realizes that both he and his children have and will always have problems as a result of the murder, he has gone back to school and is currently in the doctoral program in Clinical Psychology at Nova Southeastern University in Davie, Florida. It is a testimony to his courage and to his love for his children that he has pulled himself back from the abyss and created a new life for his family. Bobby Davis has experienced extreme trauma of long duration and will bear the scars of April 9, 1984 for the rest of his life. His change from stockbroker to clinical psychologist is evidence of the profound affect on and change in his life. In Merritt v. Karcioglu, 95-1335, 95-1336 (La. App. 4 Cir. 1/19/96), 668 So.2d 469, this court awarded $555,000.00 to the estate of a 92 year old patient who suffered a broken hip in a fall from her hospital bed, but where the broken hip was not the cause of her death seven months later, on the grounds of "the diminution of the quality of life" that she enjoyed. I would increase Bobby Davis' wrongful death award to $500,000.00. In addition, plaintiff presented evidence that Valerie Davis' funeral expenses were $3,961.94 to Jacob Schoen Funeral Home and $6,435.20 to Metairie Cemetery totaling $10,397.14 which the trial judge should have awarded.

II. Valerie's Survival Action
What must have been particularly terrifying to Valerie Davis as she was being beaten, raped and murdered, is the fact that her assailant did not know her, had never seen her before and she had done absolutely nothing. From her point of view, it was totally random. Who was this person and why was he killing her? David Puryear didn't know her and had never seen her before.
The uppermost thought in Valerie Davis' mind as she was being beaten and raped had to be "What is he going to do to my children?" For a woman who had recently given birth and in whom the maternal hormones were strongly activated, this had to be the most horrible realization. Hearing the sounds of her crying children and being unable *1313 to go to them as she lay dying[4] had to be the most excruciating of hells. $100,000.00 is grossly inadequate to me.

III. Whitney's Lejeune Claim
There is no doubt that Whitney witnessed his mother's murder. Whenever Whitney becomes angry he goes to the kitchen, grabs a knife and waives it. Bobby Davis was unable to care for his children for a period of 5 or 6 years. Thus, Whitney and Justin, in their most formative years, lost not just one parent, but two. Joan Davis testified that during the first year of Bobby's grief, Whitney became, in a sense, Bobby's protector, always going to his father and patting him. Dr. and Mrs. Davis attempted to raise the two boys. Whitney had already bonded with his mother and Justin had just started bonding with her. Joan Davis testified that Whitney has a fear of being close to anything for fear of losing it, because his mom "left"[5]. Whitney would become very angry so his grandmother concentrated on playing a lot of quiet sitting-down games with him. Joan Davis regrets that because she was older, she couldn't do all the things that their mom was able to do with them. Joan Davis has tried to keep Valerie's memory alive for the two little boys by showing them pictures, talking about their mom, and taking them to see Valerie's parents in Birmingham. Joan testified "it's just very difficult when you take your grandchildren to see their mother (and) you take them to a cemetery."
The trial court erred in failing to award Lejeune damages to Whitney Davis and I concur in the award of $150,000.00 in Lejeune damages to him.

IV. Justin's Lejeune Claim
Joan Davis testified that Justin has alot of anxiety. She noted that she was sick recently and the first thing that Justin asked her was if she was going to die. Justin has a fear of losing people.
In Lejeune, supra, at footnote 11 the Supreme Court noted:
(t)he emotional injury must be directly attributable to the emotional impact of the plaintiff's... contemporaneous sensory perception (underlines added)
One cannot examine the crime scene without realizing that it was noisy. A glass lamp shade crashed on wood parquet floors, a footboard splintered in two, books were overturned onto the floor and Valerie fought for her life. Justin heard his mother being murdered, the sounds of upheaval, the screams, if any. He was then abandoned for hours, his cries unanswered, not held, changed or fed, and his life was never the same. His contemporaneous sensory perception was the sense of hearing. I would award him Lejeune damages of $25,000.00 for hearing his mother being murdered.
NOTES
[1] Dr. LeBlanc also testified, in her experience with the State's mental health care system in 1984, principally at Charity Hospital, requested patient records often were not received. However, if SELH had a duty to request the records, then surely there was a corresponding duty on the part of another State mental hospital, ELH, to supply them. In an era (1984) when photocopies are near universal at institutions with sizable amounts of paperwork, and inexpensive overnight delivery services are readily available, there would be no excuse for a failure to forward the records. Thus, if ELH had failed to respond to an SELH request, as Dr. LeBlanc speculates would have occurred had such a request been made, the negligence would merely have shifted from one State institution, SELH, to another State institution, ELH.
[2] See also Sanchez v. State, 506 So.2d 777 (La. App. 1st Cir.1987) (released mental patient shot plaintiff, held no duty and no liability).
[3] The confusion as to the breadth of the Tarasoff holding may result from the court's discussion of the practical difficulties of taking the particular precaution of a warning when no victim is specifically identified by the patient. 131 Cal.Rptr. at 25 n. 11, 551 P.2d at 345 n. 11.
[4] In Tarasoff, there was an allegation that the defendants were liable for failure to confine the patient, but the court held that the defendants had a California statutory immunity applicable to that claim. 131 Cal.Rptr. at 31-32, 551 P.2d at 351-52.
[5] Thompson involved the release of an allegedly dangerous inmate from some type of public institution (apparently a correctional rather than a mental health institution) despite an alleged nonspecific threat by the inmate. Obviously, the real issue in Thompson was the release of the inmate, rather than a warning of his release, but the Thompson court found a California statutory immunity as to the release, so the discussion of the duty issue shifted by default to the topic of warnings.
[6] The specific situation of a patient communicating to a psychiatrist a threat to a clearly identified potential victim, and the consequent duty to warn, has now been addressed by statute in Louisiana. La.R.S. 9:2800.2. However, Section 2 of Acts 1986, No. 697, which enacted La.R.S. 9:2800.2, provides that the statute shall not apply to causes of action accruing before its effective date of July 8, 1986. Thus, we cannot apply that statute, or our caselaw decided under it, Hines v. Bick, 566 So.2d 455 (La.App. 4th Cir.1990), writ denied, 571 So.2d 648 (La.1990), to the present case which arises from events in 1984.
[1] This footnote is not contained in the original reasons for judgment. The device of the footnote is used by the writer to note that the patient is required to give written request for discharge to the director of the institution where he is admitted. At that point, the 72 hour period commences and either an emergency certificate can be issued or judicial commitment commences. David Puryear never gave a written request for discharge to anyone; he just escaped.
[2] After the murder, Bobby Davis discovered for the first time that when Kathy Franklin and her husband Milton had rented the house to them, the Franklins failed to warn Bobby and Valerie that her brother David Puryear was dangerously and violently unstable and that this was the house in which David had grown up and he might return. This was the house in which David was beaten and abused by his alcoholic father, confused by his mentally ill mother, and first experienced delusions and hallucinations in the form of "Haldo", an imaginary friend from childhood who David Puryear still has and who tells him to do "bad things". Additionally, Puryear is an Artane addict, a drug known to cause violence if not taken with antipsychotic medication. Because Artane produces a "high", it is also a street drug.
[3] The Coroner's report indicated that all of the trauma had occurred prior to death and that the cause of death was the lowest stab wound. The Coroner's report also indicated that Mrs. Davis had been raped, beaten, choked, strangled and stabbed.
[4] The Coroner's report indicated that Valerie Davis died from the stab wound, not from the previous beating, choking and strangulation with the electrical cord.
[5] Whitney witnessed his mother's murder, "lost" his father, was raised by his grandmother, a surrogate mother figure for two years, was then raised by Bobby's second wife, another surrogate mother figure that he "lost", was then raised by his grandmother again while his father went away again, and now resides with his father. For the first 8 years of his life, every two years his life radically changes.